# EXHIBIT 11

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 8-K**

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of the**
**Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported): **March 20, 2024**

**LIFECORE BIOMEDICAL, INC.**
(Exact name of registrant as specified in its charter)

| **Delaware** | **000-27446** | **94-3025618** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission file number) | (IRS Employer Identification No.) |

**3515 Lyman Boulevard**
**Chaska, Minnesota**                                    **55318**
(Address of principal executive offices)                    (Zip Code)

**(952) 368-4300**
(Registrant's telephone number, including area code)

**Not Applicable**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐    Written communication pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Trading Symbol** | **Name of each exchange on which registered** |
|---|---|---|
| Common Stock | LFCR | The NASDAQ Global Select Market |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company    ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.    ☐

1

**Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

*Chief Executive Officer ("CEO") Transition*

On March 20, 2024, Lifecore Biomedical, Inc., a Delaware corporation (the "Company") announced that Paul Josephs has been elected as the Company's President and Chief Executive Officer effective May 20, 2024 (the "Effective Date"). Mr. Josephs will succeed James G. Hall, the Company's current President and Chief Executive Officer. Mr. Josephs will be elected to the Board of Directors of the Company (the "Board") to the vacancy caused by the resignation of Mr. Hall on the later of the Effective Date or the date of the Annual Meeting of Stockholders to be held in 2024 (the "Annual Meeting"). Mr. Josephs will not receive any additional compensation in connection with his service on the Board.

From April 2021 to March 2024, Paul Josephs, age 58, served as the President and Chief Executive Officer of Woodstock Sterile Solutions ("WSS"), a full-service contract development and manufacturing organization ("CDMO") specializing in blow fill seal sterile technology. He also served as a member of the Board of Directors of WSS. In his role as President and Chief Executive Officer of WSS, Mr. Josephs was responsible for the overall financial performance and the leadership of WSS, which has approximately 450 employees. He led initiatives to develop and implement long-term strategic and annual operating plans, build the sales and marketing teams, drive revenue and EBITDA growth, and manage costs. From June 2016 to March 2021, Mr. Josephs was the Head of CDMO operations for Mylan and later Viatris Inc. (Nasdaq: VTRS), which was formed through the merger of Mylan and Upjohn Inc., a legacy division of Pfizer, on November 16, 2020. At Viatris, Mr. Josephs was responsible for the financial and operational performance of the CDMO business, including developing and executing sales and marketing tactics to grow revenue, manage pricing and profitability for all service offerings, and establishing the CDMO business within the legacy Mylan sites. From May 2012 to June 2016, Mr. Josephs was the Senior Vice President, Sales, Marketing & Corporate Development for DPT Laboratories, a leading provider of semi-solid and liquid contract development services. In 2016, Mylan acquired DPT's non-sterile CDMO business and Mr. Josephs served as a business lead integrating DPT's CDMO business into Mylan, adding programs to the CDMO portfolio, and expanding CDMO agreements within Mylan sites in the United States and Europe.

On March 20, 2024, Mr. Josephs entered into an offer letter agreement with the Company (the "Offer Letter"). The Offer Letter was recommended by the Compensation Committee and approved by the Board. Pursuant to the Offer Letter, Mr. Josephs will join the Company on the Effective Date as the Company's President and Chief Executive Officer. Mr. Josephs' employment is at-will and may be terminated at any time for any reason, subject to the terms of the Offer Letter and the Company's Executive Change in Control Severance Plan (the "CIC Severance Plan"), as described below.

Mr. Josephs will be entitled to receive the following compensation and benefits in connection with his service as President and Chief Executive Officer of the Company:

- an annual base salary of $550,000;

- a one-time new-hire bonus of $125,000, which is subject to repayment to the Company upon certain employment termination events that occur on or prior to the one-year anniversary of the Effective Date;

- beginning with the Company's fiscal year 2025, eligibility to participate in the Company's annual incentive plan and for the 2025 annual incentive plan, eligibility for a bonus of 100% of his base salary at the target level of achievement;

- a restricted stock unit ("RSU") award for 525,000 shares of the Company's common stock, which will vest and be settled as to 25,000 shares of the RSU on the Effective Date and as to 100,000 shares of the RSU on each of the first five anniversaries of the Effective Date;

- a performance stock unit ("PSU") award for up to 1,500,000 shares, divided into ten 150,000 PSU tranches that will vest, if at all, based upon the closing price of the Company's stock over a five year performance period, and to the extent the PSU award becomes vested, the Company will issue Mr. Josephs unrestricted shares of the Company's common stock on the vesting date in settlement of 50% of the vested portion of that tranche of the PSU award and will issue Mr. Josephs unrestricted shares of the Company common stock on the one year anniversary of the vesting date in settlement of the other 50% of the vested portion of that tranche of the PSU award;

- eligibility under the Company's CIC Severance Plan to receive, upon a "Qualifying Termination" of employment, benefits at the "Tier 1" level as described in the CIC Severance Plan, and if Mr. Josephs' employment is terminated by the Company without Cause (other than a Qualifying Termination), the same severance benefits under the CIC Severance Plan as if he had experienced a Qualifying Termination without duplication in the amount of or types of payments or benefits, provided that (a) the vesting of the PSUs will not be accelerated and (b) Mr. Josephs must satisfy the conditions required by the CIC Severance Plan to receive severance benefits (including execution of a general release of claims that is not revoked or rescinded);

- certain travel and temporary living benefits for so long as Mr. Josephs does not live in the vicinity of the Company's headquarters, with an initial maximum of $5,000 per month in reimbursement of these expenses; and

- participation in the benefit plans and programs of the Company in which similarly situated employees of the Company participate, as may be in effect from time to time, and five weeks of vacation per year (pro-rated for 2024).

The RSU award and PSU award to Mr. Josephs, which were material inducements to him accepting employment with the Company, will be granted on the Effective Date under the Company's Equity Inducement Plan as described below.

2

The Offer Letter also provides for entry into the Company's standard non-solicitation, confidentiality and inventions agreement. In addition, Mr. Josephs and the Company will enter into the Company's standard indemnification agreement.

There are no other arrangements or understandings between Mr. Josephs and any other persons pursuant to which Mr. Josephs was appointed President and Chief Executive Officer of the Company. Mr. Josephs does not have any family relationship with any of the Company's directors or executive officers or any persons nominated or chosen by the Company to be a director or executive officer. Other than with respect to the equity awards contemplated by this Current Report, Mr. Josephs does not beneficially own any shares of the Company's common stock, and Mr. Josephs does not have any direct or indirect material interest in any transaction or proposed transaction required to be reported under Item 404(a) of Regulation S-K.

The foregoing description of the Offer Letter is not complete and is qualified in its entirety by reference to the full text of the Offer Letter, which is attached to this Current Report on Form 8-K as Exhibit 10.1 and incorporated by reference herein.

*Equity Inducement Plan*

On March 20, 2024, upon the recommendation of the Compensation Committee of the Board, the Board adopted and approved the Company's Equity Inducement Plan (the "Inducement Plan") and reserved 3,500,000 shares of the Company's common stock to be used exclusively for grants of equity awards to individuals that were not previously employees or directors of the Company (or who are returning to employment following a bona fide period of non-employment), as an inducement material to the individual's entry into employment with the Company, pursuant to Nasdaq Listing Rule 5635(c)(4). The Inducement Plan was adopted and approved without stockholder approval pursuant to Nasdaq Listing Rule 5635(c)(4). The terms and conditions of the Inducement Plan are substantially similar to the Company's stockholder-approved 2019 Stock Incentive Plan.

The RSU award and PSU award to be granted to Mr. Josephs on the Effective Date as described in the Offer Letter will be granted under the Inducement Plan.

The foregoing description of the Inducement Plan is not complete and is qualified in its entirety by reference to the full text of the Inducement Plan, which is attached to this Current Report on Form 8-K as Exhibit 10.2 and incorporated by reference herein.

*Separation Agreement with Mr. Hall*

On March 20, 2024, the Board approved a Separation Agreement and Release between the Company and James G. Hall (the "Separation Agreement"). The Separation Agreement was recommended by the Compensation Committee. Pursuant to the Separation Agreement, Mr. Hall's employment with the Company will terminate on the first day of employment of Mr. Josephs (the "Separation Date") and Mr. Hall will resign from the Board on the Separation Date. Mr. Hall will be entitled to the following separation benefits after the Separation Agreement becomes effective:

- $750,000 paid in equal installments over 12 months on the Company's regularly scheduled payroll dates;
- the annual incentive award to which Mr. Hall is entitled, if any, under the 2024 Annual Incentive Plan, based on actual performance, pro-rated through the Separation Date for the number of days elapsed in fiscal year 2024;
- vesting in full of all outstanding stock options and restricted stock units held by Mr. Hall as of the Separation Date, with Mr. Hall eligible to exercise the stock options for a period of six months; and
- the monthly premium for continued coverage under COBRA for a period ending the earlier of the 12-month anniversary of the Separation Date and the date on which Mr. Hall becomes eligible for coverage under the group health plan of a subsequent employer.

In exchange for the payments and benefits to Mr. Hall, Mr. Hall will release the Company from any and all claims (with certain limited exceptions), has agreed to provide certain assistance and cooperation, and, at the Company's request, will be available to consult with the Company following the Separation Date for a period of one year without the payment of further consideration.

The foregoing description of the Separation Agreement is not complete and is qualified in its entirety by reference to the full text of the Separation Agreement, which is attached to this Current Report on Form 8-K as Exhibit 10.3 and incorporated by reference herein.

*2024 Annual Incentive Plan*

On March 20, 2024, the Board approved a cash-incentive award plan for the Company's fiscal year 2024 (the "2024 Annual Incentive Plan"), which was recommended by the Compensation Committee.

Under the 2024 Annual Incentive Plan, executive officers and other participants are eligible to earn cash bonuses based on the Company's adjusted earnings before interest, taxes, depreciation and amortization ("EBITDA") and revenue, weighted at 71% and 29%, respectively. Adjusted EBITDA for purposes of the 2024 Annual Incentive Plan will be based on the Company's fiscal year 2024 EBITDA excluding standalone, start-up and non-recurring, strategic review process and stock based compensation costs, but including the cost of bonuses under the 2024 Annual Incentive Plan. The Company's revenue for fiscal year 2024 will be determined in conformity with accounting principles generally accepted in the United States of America ("GAAP").

Under the 2024 Annual Incentive Plan, achievement of a performance goal at greater than target level will result in proportionately increasing incentive pay relating to that performance goal. If the target performance goal for a performance goal is not

achieved, there will be no incentive pay with respect to that performance goal. Additionally, no amounts will be earned under the 2024 Annual Incentive Plan unless a specified minimum adjusted EBITDA is achieved. The maximum cash incentive pay that may be earned under the 2024 Annual Incentive Plan by an executive officer or any other participant will not exceed 200% of that person's opportunity at the target level, even if actual performance exceeds the maximum level for either or both of the performance goals.

The Board also approved, based upon the recommendation of the Compensation Committee, the cash incentive pay that the executive officers may earn under the 2024 Annual Incentive Plan at the target level of achievement as a percentage of their respective annual base salaries as follows: James G. Hall and John D. Morberg, 100% and 60%, respectively.

All payments to the executive officers under the 2024 Annual Incentive Plan are subject to "clawback" under the Company's Compensation Recoupment Policy adopted effective October 2, 2023.

*Resignation of Craig Barbarosh as Director*

On March 20, 2024, Craig Barbarosh notified the Company that he has elected not to stand for re-election to serve as a director of the Board at the Annual Meeting. Mr. Barbarosh's decision was not the result of any disagreement with the Company on any matter relating to the Company's operations, policies, or practices. On March 20, 2024, the Board approved the appointment of Katrina L. Houde as Chairperson of the Board, effective as of the Annual Meeting.

**Item 7.01 Regulation FD Disclosure.**

On March 20, 2024, the Company issued a press release announcing Mr. Hall's intention to resign as a director of the Board and to retire as the Company's President and Chief Executive Officer, the appointment of Mr. Josephs as a director of the Board and the Company's President and Chief Executive Officer, and Mr. Barbarosh's intent not to stand for re-election to serve as a director of the Board at the Annual Meeting. A copy of this press release is furnished as Exhibit 99.1 to this Current Report on Form 8-K and is incorporated herein by reference.

The information in this Item 7.01, including Exhibit 99.1, shall not be deemed "filed" for purposes of Section 18 of the Exchange Act, or otherwise subject to the liabilities of that section, nor shall it be deemed to be incorporated by reference into any filing under the Securities Act of 1933, as amended, or the Exchange Act, except as expressly set forth by specific reference in such filing.

**Item 9.01 Financial Statements and Exhibits.**

(d) Exhibits.

The following exhibits are furnished as part of this report:

| Exhibit No. | Description |
| --- | --- |
| 10.1 | Offer Letter, dated March 20, 2024, by and between the Company and Paul Josephs |
| 10.2 | Lifecore Biomedical, Inc. Equity Inducement Plan |
| 10.3 | Separation Agreement, approved March 20, 2024, by and between the Company and James G. Hall |
| 99.1 | Press Release of Lifecore Biomedical, Inc., dated March 20, 2024 |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document). |

4

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Date: March 20, 2024

LIFECORE BIOMEDICAL, INC.

By: /s/ John D. Morberg
      John D. Morberg
      Chief Financial Officer

5



3515 Lyman Blvd
Chaska, MN 55318

Date: March 20, 2024

Paul Josephs
17 Grogan Mill
San Antonio, TX 78248

Dear Paul,

Congratulations! We are very pleased to offer you the position of President and Chief Executive Officer of Lifecore Biomedical, Inc. ("Lifecore" or "Company"). You will report to Lifecore's board of directors. Your first day of employment will be May 20, 2024 ("Effective Date") and your employment will be subject to the terms and conditions set forth in this offer letter, as well as the policies of the Company, as may be amended from time to time. You also will be elected to the Lifecore board of directors with service to start on the later of the Effective Date or the date of Lifecore's Annual Meeting of Stockholders to be held in 2024.

Your employment with Lifecore will be "full-time." You are expected to devote substantially all of your business time, energy, skills and best efforts to the performance of your duties. You will not engage in any other business activities except that, beginning one year after the Effective Date, you may serve on the board of directors of one for profit company that does not compete with Lifecore provided that such activities do not interfere with the performance of your duties. Prior to joining a board of directors, you must disclose of the details and obtain the prior written consent of the Lifecore board of directors.

Unless you determine that business travel for the Company demands otherwise, it is agreed that generally you will work from the Company's headquarters in Chaska, Minnesota.

This letter highlights the basic components of your compensation and benefits. It is not intended to be a comprehensive description of all benefits available to you or to provide the details of the plans that govern the administration of compensation, and benefits, as our offerings change periodically. Your compensation and benefits will be established by the Lifecore compensation committee and board of directors and are typically reviewed and may be adjusted annually.

Beginning on the Effective Date, your compensation as President and Chief Executive Officer will be comprised of the following:

**Base Salary**: Your initial base salary will be $550,000 annualized, less applicable deductions and withholdings, paid bi-weekly in accordance with Lifecore's normal payroll practices. The statement of annualized salary does not imply a guarantee of employment or salary for any

specific length of time. Your compensation will be established by the Lifecore compensation committee and board of directors and are typically reviewed and may be adjusted annually.

**New Hire Bonus**: Lifecore will pay you a cash lump sum payment of $125,000, less applicable withholding, with the first paycheck following the Effective Date. If your employment terminates within one year after the Effective Date (other than (a) a "Qualifying Termination" as defined in the Company's Executive Change in Control Severance Plan (as amended and as may be amended from time to time, the "CIC Severance Plan")) or (b) by the Company without "Cause" as defined in the CIC Severance Plan), you agree to repay the entire gross amount of this bonus to the Company within 30 days following your termination date. In the event of a repayment, the Company will make appropriate adjustments to your tax withholdings, reflecting the fact of said repayment.

**Annual Cash Incentive**: Beginning with Lifecore's fiscal year 2025, you will be eligible to participate in Lifecore's annual incentive plan ("AIP"), which is a cash incentive program based upon Lifecore's achievement of specific annual performance goals as determined by the Lifecore compensation committee, and will be eligible to participate in any successor or similar plan maintained by Lifecore for the benefit of executive officers, subject to the terms and conditions of such plans and at the discretion of and subject to approval by the compensation committee and/or board of directors. For the 2025 AIP, you will be eligible for a bonus of 100% of your base salary at the target level of achievement. The Lifecore compensation committee and/or board of directors will determine Lifecore's achievement against the performance goals of the 2025 AIP following the completion of the 2025 fiscal year. You must be employed as of the end of the fiscal year and as of the payment date to be eligible to receive a bonus under the 2025 AIP. Additionally, all incentive compensation is subject to "clawback" as provided in the Company's Compensation Recoupment Policy. On or before the Effective Date, you will be required to execute and deliver an acknowledgment that you are bound by and subject to the Compensation Recoupment Policy.

**Equity-Based Awards**: As a material inducement to you accepting employment with Lifecore, you will be granted the following equity-based awards effective as of the Effective Date, with all awards granted under a board-approved Equity Inducement Plan and subject to award agreements that will be provided to you following the Effective Date:

- a restricted stock unit (RSU) award for 525,000 shares of Lifecore common stock, which will vest and be settled as to 25,000 shares of the RSU on the Effective Date and as to 100,000 shares of the RSU on each of the first five anniversaries of the Effective Date; and

- a performance stock unit (PSU) award for up to 1,500,000 shares, divided into ten 150,000 PSU tranches. If a tranche of the PSU award vests during the five-year performance period following the Effective Date, Lifecore will issue you unrestricted shares of Lifecore common stock on the vesting date in settlement of 50% of the vested portion of that tranche of the PSU award and will issue you unrestricted shares of Lifecore common stock on the one year anniversary of the vesting date in settlement of the other 50% of the vested portion of that tranche of the PSU award.

  One tranche of 150,000 shares of the PSU award will vest if Lifecore's closing stock price exceeds one of ten closing price thresholds for at least 20 consecutive trading days within the five year performance period. The ten closing price thresholds will be set on the Effective Date and will be ten consecutive closing price thresholds from the table below beginning with a closing price threshold that is closest to, but exceeds, the volume weighted average price of Lifecore's common stock for the 10 trading days prior to the Effective Date. By way of example, if the volume weighted average price of Lifecore's

2

common stock for the 10 trading days prior to the Effective Date was $6.35 per share, then the applicable closing price thresholds for the PSU award would be numbers 2 through 11, inclusive.

| Tranche Number | Closing Price Threshold |
|---|---|
| 1. | $5.00 |
| 2. | $7.50 |
| 3. | $10.00 |
| 4. | $12.50 |
| 5. | $15.00 |
| 6. | $17.50 |
| 7. | $20.00 |
| 8. | $22.50 |
| 9. | $25.00 |
| 10. | $30.00 |
| 11. | $35.00 |
| 12. | $40.00 |

If, as of the last day of the five year performance period, there are any PSUs that have not vested, such unvested PSUs will be forfeited to the Company. If your employment with the Company terminates during the performance period (other than a Qualifying Termination as described in the CIC Severance Plan or as described below under "CIC Severance Plan; Severance"), all vested and unvested PSUs will be forfeited to the Company as of the date of such termination.

For the purposes of the CIC Severance Plan, the "target" level of performance for the PSUs will be based on the value of the per share consideration received by holders of Lifecore common stock in the Change in Control. To the extent that the per share consideration for Lifecore's common stock in such Change in Control transaction is between the prices in two of the tranches above, the PSU vesting will be prorated based on straight line calculation.

Given these equity awards, you will be eligible for consideration for additional awards beginning five years after the Effective Date. All awards are at the discretion of and subject to approval by the Lifecore compensation committee and/or the board of directors.

**Relocation:** Your position will be based in Lifecore's headquarters in Chaska, Minnesota. While you will not be required to maintain a residence in the same location as Lifecore's headquarters, you will spend a majority of your working time at the Lifecore's headquarters.

For so long as you do not live in the vicinity of the Lifecore's headquarters, Lifecore will reimburse you for reasonable out of pocket expenses, up to a maximum amount to be set by the compensation committee annually, associated with (1) monthly rent of an apartment, hotel accommodations or other similar temporary housing (including utilities); (2) rental car or a car allowance for travel in the Twin Cities; and (3) airfare for four trips per month from your current residence to the Twin Cities. Reimbursement is not provided for personal meal or entertainment

3

expenses during your in-office time, unless those expenses are for business purposes. Initially, the maximum amount of reimbursement of these expenses will be $5,000 per month.

**CIC Severance Plan; Severance:** While we hope that you will have a long, successful and rewarding career with Lifecore, this offer is for "at will" employment, meaning that either you or Lifecore may terminate your employment at any time and for any reason, subject to the provisions of this section. As used in this section, the terms "Cause," "Qualifying Termination," and "Severance Benefits" have the meanings ascribed to them in the CIC Severance Plan.

- You will become a participant in the CIC Severance Plan upon execution, on or before the Effective Date, of a Participation Notice as provided in the CIC Severance Plan. The Participation Notice will provide that your benefits under the CIC Severance Plan will be at the "Tier 1" level as described on Exhibit A to the CIC Severance Plan. A copy of the CIC Severance Plan is enclosed.

- If your employment is terminated by Lifecore without Cause (other than a Qualifying Termination), you will be entitled to the same Severance Benefits under the CIC Severance Plan as if you had experienced a Qualifying Termination; provided that (a) the vesting of the PSUs will not be accelerated and (b) you must satisfy the conditions required by the CIC Severance Plan to receive Severance Benefits (including that you execute a general release of claims as provided in the CIC Severance Plan and you do not revoke or rescind such release). In no event will you receive or be entitled to any duplication in the amount of or types of payments or benefits to you in the event of termination of employment.

**Indemnification:** You will be indemnified during your employment and after the end of your employment in accordance with the provisions of Lifecore's Certificate of Incorporation and Bylaws and the Delaware General Corporation Law and the Company's standard form of indemnification agreement.

**Paid Time Off**: You will accrue and be entitled to take paid vacation pursuant to the Company's existing policies and applicable law regarding paid vacations. You will be entitled to five weeks of paid vacation per year, pro-rated for 2024.

4

**Benefits**: Subject to eligibility, you will be entitled to participate in all of Lifecore's benefit plans for similarly situated employees. Unless otherwise specified in this letter, your eligibility for any benefits will be in accordance with Lifecore's then-current plans, policies, and programs for similarly situated employees. In addition, during your employment, Lifecore will pay, or at its election, reimburse you, for an annual physical exam and monthly concierge health services at Health By Design in San Antonio or other such facility selected by you and approved by the Lifecore compensation committee with such costs not to exceed $5,000 annually.

**Other Terms and Conditions:**

As a condition of your employment as President and Chief Executive Officer, you are required to sign a non-solicitation, confidentiality and inventions agreement, which is enclosed with this letter. Additionally, this offer of employment is contingent upon you providing proof of your eligibility to work in the United States upon your start of employment in accordance with federal law and successful completion of a background check.

By signing below, you confirm that you do not have any type of written or oral non-competition agreement or any other agreement that would prevent you from accepting this offer of employment or performing services for Lifecore. You agree that during your employment with Lifecore you will not use and/or disclose confidential information obtained from previous employers or any other third party to whom you owe a duty of confidentiality, unless the information is publicly known or your previous employer(s) or the third party has represented to you that you are entitled to use and/or disclose the information. If you have any type of written or oral non-competition agreement or any other agreement that is currently in force and effect, you have provided a copy for Lifecore to review. This offer of employment is contingent upon Lifecore's determination that such other agreement(s) do not limit or prevent you from accepting this offer or from performing the services required by your position as President and CEO of Lifecore.

This offer letter supersedes any prior representations or agreements, whether written or oral, with respect to our offer of employment to you. This letter may not be modified or amended except by a written agreement, signed by Lifecore and you.

This letter will be governed by, and construed in accordance with, the substantive laws of the State of Minnesota without regard to its conflict of law principles, unless a superseding Federal law is applicable. You agree that the state and federal courts located in the State of Minnesota, without regard to or application of conflict of laws principles, will have jurisdiction in any action, suit or proceeding based on or arising out of this letter, the documents referenced herein and your employment relationship with Lifecore. You hereby: (a) submit to the personal jurisdiction of such courts; (b) consent to service of process in connection with any action, suit or proceeding against you; and (c) waive any other requirement (whether imposed by statute, rule of court or otherwise) with respect to personal jurisdiction, venue or service of process.

On behalf of the Lifecore board of directors, we are excited for your leadership and look forward to your contributions to Lifecore's future success.

5

Please indicate your acceptance of this offer by countersigning and returning this letter to me. We will hold this offer open until 5:00 p.m. Central Time on the business day following the date of this letter, at which time this offer will expire if not accepted. As always, please contact me if you have questions.

Lifecore Biomedical, Inc.

/s/ Katrina Houde-Lovas

Katrina Houde-Lovas
For the Board of Directors

ACCEPTED AND AGREED:

/s/ Paul Josephs_____
Paul Josephs

Dated: March 20, 2024

6

## LIFECORE BIOMEDICAL, INC.

## EQUITY INDUCEMENT PLAN

Effective Date March 20, 2024

SECTION 1.    INTRODUCTION.

1.1    The Lifecore Biomedical, Inc. Equity Inducement Plan (the "Plan") will be effective on the Effective Date.

1.2    The purpose of the Plan is to promote the long-term success of the Company and the creation of stockholder value by attracting Key Service Providers who are expected to contribute to the success of the Company or its Subsidiaries as employees by providing such Key Service Providers with an Award as an inducement material to such individual's entering into employment with the Company or any of its Subsidiaries. All Awards under the Plan are intended to qualify as an inducement award as described in Nasdaq Listing Rule 5635(c)(4) or any successor provision of such listing rule (the "Inducement Award Rules").

1.3    Consistent with the Inducement Award Rules, the Plan seeks to achieve its purpose by providing for discretionary Awards to Key Service Providers in the form of Options (which may constitute Incentive Stock Options or Nonstatutory Stock Options), Stock Appreciation Rights, Stock Grants and Stock Units.

1.4    The Plan shall be governed by, and construed in accordance with, the laws of the State of Delaware (except its choice-of-law provisions), and with the applicable requirements of the stock exchanges or other trading systems on which the Stock is listed or entered for trading, in each case as determined by the Committee. Capitalized terms shall have the meaning provided in Section 2 unless otherwise provided in this Plan or any related Stock Option Agreement, SAR Agreement, Stock Grant Agreement or Stock Unit Agreement.

SECTION 2.    DEFINITIONS.

2.1    "Affiliate" means any entity other than a Subsidiary if the Company and/or one or more Subsidiaries have a controlling interest in such entity. For purposes of the preceding sentence, except as the Committee may otherwise determine subject to the requirements of Treas. Reg. §1.409A-1(b)(5)(iii)(E)(1), the term "controlling interest" has the same meaning as provided in Treas. Reg. §1.414(c)-2(b)(2)(i), provided that the words "at least 50 percent" are used instead of the words "at least 80 percent" each place such words appear in Treas. Reg. §1.414(c)-2(b)(2)(i). The Company may at any time by amendment provide that different ownership thresholds (consistent with Section 409A of the Code) apply but any such change shall not be effective for twelve (12) months.

2.2    "Award" means any award of an Option, SAR, Stock Grant or Stock Unit under the Plan.

2.3    "Board" means the Board of Directors of the Company, as constituted from time to time.

2.4    "Cashless Exercise" means, to the extent that a Stock Option Agreement so provides and as permitted by applicable law, (i) a program approved by the Committee in which payment may be made all or in part by delivery (on a form prescribed by the Committee) of an irrevocable direction to a securities broker to sell Shares and to deliver all or part of the sale proceeds to the Company in payment of the aggregate Exercise Price and any applicable tax

withholding obligations relating to the Option or (ii) the withholding of that number of Shares otherwise deliverable upon exercise of the Option whose aggregate Fair Market Value is equal to the aggregate Exercise Price.

2.5   "Cause" means, except as may otherwise be provided in a Participant's employment agreement or Award agreement to the extent such agreement is in effect at the relevant time, any of the following events: (i) the Participant's willful failure substantially to perform his or her duties and responsibilities to the Company or deliberate violation of a Company policy; (ii) the Participant's commission of any act of fraud, embezzlement, dishonesty or any other willful misconduct that has caused or is reasonably expected to result in material injury to the Company; (iii) unauthorized use or disclosure by the Participant of any proprietary information or trade secrets of the Company or any other party to whom the Participant owes an obligation of nondisclosure as a result of his or her relationship with the Company; or (iv) the Participant's willful breach of any of his or her obligations under any written agreement or covenant with the Company. The determination as to whether a Participant is being terminated for Cause shall be made in good faith by the Company and shall be conclusive and binding on the Participant. The foregoing definition does not in any way limit the Company's ability to terminate a Participant's Service at any time as provided in Section 12.1, and the term "Company" will be interpreted to include any Subsidiary, Parent, Affiliate, or any successor thereto, if appropriate.

2.6   "Change In Control" except as may otherwise be provided in a Participant's employment agreement or Award agreement, means the first to occur of any of the following: (i) the consummation of a merger or consolidation of the Company with or into another entity or any other corporate reorganization if more than 50% of the combined voting power of the continuing or surviving entity's securities outstanding immediately after such transaction is owned by persons who were not stockholders of the Company immediately prior to such transaction; (ii) the sale, transfer or other disposition of all or substantially all of the Company's assets; (iii) the direct or indirect sale or exchange in a single transaction or series of related transactions by the stockholders of the Company of more than 50% of the voting stock of the Company to an unrelated person or entity if more than 50% of the combined voting power of the surviving entity's securities outstanding immediately after such transaction is owned by persons who were not stockholders of the Company immediately prior to such transaction; (iv) a complete liquidation or dissolution of the Company; or (v) a majority of the members of the Board is replaced during any 12-month period with members whose appointment or election is not endorsed by a majority of the members of the Board before the date of appointment or election. A transaction shall not constitute a Change in Control if its sole purpose is to change the state of the Company's incorporation or to create a holding company that will be owned in substantially the same proportions by the persons who held the Company's securities immediately before such transactions.

2.7   "Code" means the Internal Revenue Code of 1986, as amended, and the regulations and interpretations promulgated thereunder.

2.8   "Committee" means a committee described in Section 3.

2.9   "Common Stock" means the Company's common stock, par value $0.001 per share.

2.10   "Company" means Lifecore Biomedical, Inc., a Delaware corporation.

2.11   "Consultant" means an individual who provides bona fide services to the Company, a Parent, a Subsidiary or an Affiliate, other than as an Employee or Director or Non-Employee Director; provided that such services are not in connection with the offer or sale of

2

securities in a capital raising transaction, and do not directly or indirectly promote or maintain a market for the securities of the Company or its Parent, Subsidiary or Affiliates.

2.12   "Director" means a member of the Board who is also an Employee.

2.13   "Disability" means that the Participant is classified as disabled under a long-term disability policy of the Company or, if no such policy applies, the Participant is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

2.14   "Effective Date" means the date that the Plan is approved by the Board.

2.15   "Employee" means any individual who is a common law employee of the Company, a Parent, a Subsidiary or an Affiliate.

2.16   "Exchange Act" means the Securities Exchange Act of 1934, as amended.

2.17   "Exercise Price" means, in the case of an Option, the amount for which a Share may be purchased upon exercise of such Option, as specified in the applicable Stock Option Agreement. "Exercise Price," in the case of a SAR, means an amount, as specified in the applicable SAR Agreement, which is subtracted from the Fair Market Value in determining the amount payable upon exercise of such SAR.

2.18   [Reserved]

2.19   "Fair Market Value" means the market price of a Share as determined in good faith by the Committee. Such determination shall be conclusive and binding on all persons. The Fair Market Value shall be determined by the following: (i) if the Shares are admitted to trading on any established national stock exchange or market system, including without limitation the Nasdaq Stock Market, on the date in question, then the Fair Market Value shall be equal to the closing sales price for such Shares as quoted on such national exchange or system on such date; or (ii) if the Shares are admitted to quotation on the Nasdaq Stock Market or are regularly quoted by a recognized securities dealer but selling prices are not reported on the date in question, then the Fair Market Value shall be equal to the mean between the bid and asked prices of the Shares reported for such date.

In each case, the applicable price shall be the price reported in The Wall Street Journal or such other source as the Committee deems reliable; provided, however, that if there is no such reported price for the Shares for the date in question, then the Fair Market Value shall be equal to the price reported on the last preceding date for which such price exists. If neither (i) or (ii) are applicable, then the Fair Market Value shall be determined by the Committee in good faith on such basis as it deems appropriate, consistent with the requirements of Section 409A or Section 422 of the Code, to the extent applicable.

2.20   "Fiscal Year" means the Company's fiscal year.

2.21   "Grant" means any grant of an Award under the Plan.

2.22   "Incentive Stock Option" or "ISO" means a stock option intended to be an "incentive stock option" within the meaning of Section 422 of the Code.

2.23   "Key Service Provider" means a person, not previously an Employee, Director or Non-Employee Director of the Company, or following a bona fide period of non-employment, who has been selected by the Committee to receive an Award under the Plan consistent with the

3

Inducement Award Rules as an inducement material to the person's entering into employment with the Company.

2.24    "Non-Employee Director" means a member of the Board who is not an Employee.

2.25    "Nonstatutory Stock Option" or "NSO" means a stock option that is not an ISO.

2.26    "Option" means an ISO or NSO granted under the Plan entitling the Optionee to purchase Shares.

2.27    "Optionee" means an individual, estate that holds an Option.

2.28    "Parent" means any corporation (other than the Company) in an unbroken chain of corporations ending with the Company, if each of the corporations other than the Company owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain. A corporation that attains the status of a Parent on a date after the adoption of the Plan shall be considered a Parent commencing as of such date.

2.29    "Participant" means an individual or estate that holds an Award under the Plan.

2.30    "Performance Goals" means one or more objective measurable performance factors as determined by the Committee with respect to each Performance Period based upon one or more factors (measured either absolutely or by reference to an index or indices and determined either on a consolidated basis or, as the context permits, on a Parent, Company, Affiliate, Subsidiary, divisional, line of business, unit, project or geographical basis or in combinations thereof), including, but not limited to: (i) operating income; (ii) earnings before interest, taxes, depreciation and amortization ("EBITDA"); (iii) earnings; (iv) cash flow; (v) market share; (vi) sales or revenue; (vii) expenses; (viii) cost of goods sold; (ix) profit/loss or profit margin; (x) working capital; (xi) return on equity or assets; (xii) earnings per share; (xiii) economic value added ("EVA"); (xiv) price/earnings ratio; (xv) debt or debt-to-equity; (xvi) accounts receivable; (xvii) writeoffs; (xviii) cash; (xix) assets; (xx) liquidity; (xxi) operations; (xxii) intellectual property (e.g., patents); (xxiii) product development; (xxiv) regulatory activity; (xxv) manufacturing, production or inventory; (xxvi) mergers and acquisitions or divestitures; and/or (xxvii) financings or refinancings. The Committee may provide that one or more of the Performance Goals applicable to such Award will be adjusted in an objectively determinable manner to reflect events (for example, but without limitation, acquisitions or dispositions) occurring during the Performance Period that affect the applicable Performance Goals.

2.31    "Performance Period" means any period as determined by the Committee, in its sole discretion. The Committee may establish different Performance Periods for different Participants, and the Committee may establish concurrent or overlapping Performance Periods.

2.32    "Plan" means this Lifecore Biomedical, Inc. Equity Inducement Plan, as it may be amended from time to time.

2.33    [Reserved]

2.34    "SAR Agreement" means the agreement described in Section 7 evidencing each Award of a Stock Appreciation Right.

2.35    "SEC" means the Securities and Exchange Commission.

2.36    "Section 16 Persons" means those officers, directors or other persons who are subject to Section 16 of the Exchange Act.

2.37    "Securities Act" means the Securities Act of 1933, as amended.

4

2.38    "Service" means service as an Employee, Director, Non-Employee Director or Consultant. A Participant's Service does not terminate if he or she is an Employee and goes on a bona fide leave of absence that was approved by the Company in writing and the terms of the leave provide for continued service crediting, or when continued service crediting is required by applicable law. However, for purposes of determining whether an Option is entitled to continuing ISO status, an Employee's Service will be treated as terminating 90 days after such Employee went on leave, unless such Employee's right to return to active work is guaranteed by law or by a contract. Service terminates in any event when the approved leave ends, unless such Employee immediately returns to active work. The Committee determines which leaves count toward Service, and when Service terminates for all purposes under the Plan. Further, unless otherwise determined by the Committee, a Participant's Service shall not be deemed to have terminated merely because of a change in the capacity in which the Participant provides service to the Company, a Parent, Subsidiary or Affiliate, or a transfer between entities (the Company or any Parent, Subsidiary, or Affiliate); except that, for purposes of Section 4.7(i) only, a Participant's Service shall be deemed to terminate if he or she is an Employee and thereafter becomes a Consultant but, for the avoidance of doubt, a Participant's Service shall not be deemed to terminate if he or she is an Employee and thereafter remains or becomes a Non-Employee Director (even if the Participant is also a Consultant) (it being understood that any post-termination exercise period set forth in Section 4.7(iii) or (iv) shall commence when the Participant ceases to provide Service in any capacity listed herein); provided, however, in all cases that there is no interruption or other termination of Service.

2.39    "Share" means one share of Common Stock.

2.40    "Stock Appreciation Right" or "SAR" means a stock appreciation right awarded under the Plan.

2.41    "Stock Grant" means Shares awarded under the Plan.

2.42    "Stock Grant Agreement" means the agreement described in Section 8 evidencing each Award of a Stock Grant.

2.43    "Stock Option Agreement" means the agreement described in Section 6 evidencing each Award of an Option.

2.44    "Stock Unit" means a bookkeeping entry representing the equivalent of one Share, as awarded under the Plan.

2.45    "Stock Unit Agreement" means the agreement described in Section 9 evidencing each Award of a Stock Unit.

2.46    "Subsidiary" means any corporation (other than the Company) or other entity in a chain of corporations or other entities in which each corporation or other entity has a controlling interest in another corporation or other entity in the chain, beginning with the Company and ending with such corporation or other entity. For purposes of the preceding sentence, except as the Committee may otherwise determine subject to the requirements of Treas. Reg. §1.409A-1(b)(5)(iii)(E)(1), the term "controlling interest" has the same meaning as provided in Treas. Reg. §1.414(c)-2(b)(2)(i), provided that the words "at least 50 percent" are used instead of the words "at least 80 percent" each place such words appear in Treas. Reg. §1.414(c)-2(b)(2)(i). The Company may at any time by amendment provide that different ownership thresholds (consistent with Section 409A of the Code) apply but any such change shall not be effective for twelve (12) months. A corporation or other entity that attains the status of a Subsidiary on a date after the adoption of the Plan shall be considered a Subsidiary commencing as of such date.

5

2.47    "10-Percent Stockholder" means an individual who owns more than 10% of the total combined voting power of all classes of outstanding stock of the Company, its Parent or any of its Subsidiaries. In determining stock ownership, the attribution rules of Section 424(d) of the Code shall be applied.

SECTION 3.    ADMINISTRATION.

3.1    <u>Committee Composition</u>. The Compensation Committee of the Board that complies with the independence and other composition requirements of the Inducement Award Rules (the "Compensation Committee") shall be the Committee. If no such Compensation Committee has been appointed, the majority of the Company's independent directors shall constitute the Committee in accordance with the Inducement Award Rules. Members of the Committee shall serve for such period of time as the Board may determine and shall be subject to removal by the Board at any time. The Board may also at any time terminate the functions of the Committee and reassume all powers and authority previously delegated to the Committee; provided that Awards shall be granted only by action of the majority of the Company's independent directors or as otherwise permitted by the Inducement Award Rules.

(a)    The Committee shall have membership composition which enables it to make awards to Section 16 Persons to qualify as exempt from liability under Section 16(b) of the Exchange Act.

3.2    <u>Authority of the Committee</u>. Subject to the provisions of the Plan and the Inducement Award Rules, the Committee shall have full authority and sole discretion to take any actions it deems necessary or advisable for the administration of the Plan. Such actions shall include, without limitation: (i) selecting Key Service Providers who are to receive Awards under the Plan; (ii) determining the type, number, vesting requirements and other features and conditions of such Awards and amending such Awards; (iii) correcting any defect, supplying any omission, or reconciling any inconsistency in the Plan or any Award agreement; (iv) accelerating the vesting, or extending the post-termination exercise term, of Awards at any time and under such terms and conditions as it deems appropriate; (v) interpreting the Plan; (vi) making all other decisions relating to the operation of the Plan; and (vii) adopting such plans or subplans as may be deemed necessary or appropriate to provide for the participation by employees of the Company and its Subsidiaries and Affiliates who reside outside the U.S., which plans and/or subplans shall be attached hereto as Appendices. Subject to the Inducement Award Rules, the Committee may adopt such rules or guidelines as it deems appropriate to implement the Plan. The Committee's determinations under the Plan shall be final and binding on all persons.

3.3    <u>Indemnification</u>. To the maximum extent permitted by applicable law, each member of the Committee, and of the Board, shall be indemnified and held harmless by the Company against and from (i) any loss, cost, liability, or expense that may be imposed upon or reasonably incurred by him or her in connection with or resulting from any claim, action, suit, or proceeding to which he or she may be a party or in which he or she may be involved by reason of any action taken or failure to act under the Plan or any Award agreement, and (ii) from any and all amounts paid by him or her in settlement thereof, with the Company's approval, or paid by him or her in satisfaction of any judgment in any such claim, action, suit, or proceeding against him or her, provided he or she shall give the Company an opportunity, at its own expense, to handle and defend the same before he or she undertakes to handle and defend it on his or her own behalf. The foregoing right of indemnification shall not be exclusive of any other rights of indemnification to which such persons may be entitled under the Company's Certificate of Incorporation or Bylaws, by contract, as a matter of law, or otherwise, or under any power that the Company may have to indemnify them or hold them harmless.

SECTION 4.    GENERAL.

6

4.1    <u>General Eligibility</u>. Only Key Service Providers shall be eligible to participate in the Plan.

4.2    <u>Incentive Stock Options</u>. Only Key Service Providers who are Employees of the Company, a Parent or a Subsidiary shall be eligible for the grant of ISOs. In addition, a Key Service Provider who is a 10-Percent Stockholder shall not be eligible for the grant of an ISO unless the requirements set forth in Section 422(c)(5) of the Code are satisfied.

4.3    <u>Restrictions on Shares</u>. Any Shares issued pursuant to an Award shall be subject to such rights of repurchase, rights of first refusal, "drag-along rights" and other transfer restrictions as the Committee may determine, in its sole discretion. Such restrictions shall apply in addition to any restrictions that may apply to holders of Shares generally and shall also comply to the extent necessary with applicable law. In no event shall the Company be required to issue fractional Shares under this Plan.

4.4    <u>Beneficiaries</u>. Unless stated otherwise in an Award agreement, a Participant may designate one or more beneficiaries with respect to an Award by timely filing the prescribed form with the Company. A beneficiary designation may be changed by filing the prescribed form with the Company at any time before the Participant's death. If no beneficiary was designated or if no designated beneficiary survives the Participant, then after a Participant's death any vested Award(s) shall be transferred or distributed to the Participant's estate.

4.5    <u>Performance Conditions</u>. The Committee may, in its discretion, include performance conditions in an Award. If performance conditions are included in Awards, then such Awards will be subject to the achievement of Performance Goals established by the Committee. Before any Shares underlying an Award or any Award payments are released to a Participant with respect to a Performance Period, the Committee shall certify in writing that the Performance Goals for such Performance Period have been satisfied.

4.6    <u>No Rights as a Stockholder</u>. A Participant, or a transferee of a Participant, shall have no rights as a Stockholder with respect to any Common Stock covered by an Award until such person has satisfied all of the terms and conditions to receive such Common Stock, has satisfied any applicable withholding or tax obligations relating to the Award and the Shares have been issued to such person (as evidenced by an appropriate entry on the books of the Company or a duly authorized transfer agent of the Company).

4.7    <u>Termination of Service</u>. Unless the applicable Award agreement or, with respect to Participants who reside in the U.S., the applicable employment agreement provides otherwise, the following rules shall govern the vesting, exercisability and term of outstanding Awards held by a Participant in the event of termination of such Participant's Service (in all cases subject to the term of the Option and/or SAR as applicable): (i) upon termination of Service for any reason, all unvested portions of any outstanding Awards shall be immediately forfeited without consideration and the vested portions of any outstanding Stock Units shall be settled upon termination; (ii) if the Service of a Participant is terminated for Cause, then all unexercised Options and/or SARs, unvested portions of Stock Units and unvested portions of Stock Grants shall terminate and be forfeited immediately without consideration; (iii) if the Service of a Participant is terminated for any reason other than for Cause, death, or Disability, then the vested portion of his or her then-outstanding Options and/or SARs may be exercised by such Participant or his or her personal representative within six months after the date of such termination; or (iv) if the Service of a Participant is terminated due to death or Disability, the vested portion of his or her then-outstanding Options and/or SARs may be exercised within six months after the date of termination of Service. In no event shall an Option or SAR be exercisable following the end of the term of such Option or SAR, as applicable.

7

4.8    Coordination with Other Plans. Awards under the Plan may be granted in tandem with, or in satisfaction of or substitution for, other Awards under the Plan or awards made under other compensatory plans or programs of the Company or its Subsidiaries or Affiliates.

4.9    Vesting Period. The Committee shall determine for each Award any service-based vesting conditions, Performance Goals, performance periods and other vesting and delivery terms. The Committee shall have the discretion to provide for accelerated exercisability or vesting of any Award, including in cases of retirement, death, Disability or a Change in Control, in the terms of the Award agreement or otherwise.

SECTION 5.    SHARES SUBJECT TO PLAN

5.1    Available Shares. The aggregate number of Shares reserved for Awards under the Plan shall be equal to 3,500,000 Shares, subject to adjustment pursuant to Section 10, all of which may be issued as ISOs. Shares issued under the Plan may consist of authorized but unissued Shares, Shares purchased on the open market or treasury Shares.

5.2    Additional Shares. If Awards expire, are forfeited or are terminated for any reason before being exercised or becoming vested or if the Awards are settled in cash, then the Shares underlying such Awards shall again become available for Awards under the Plan. SARs to be settled in Shares shall be counted in full against the number of Shares available for issuance under the Plan, regardless of the number of Shares issued upon settlement of the SARs. Notwithstanding anything to the contrary contained herein, the following Shares shall not be added back to the Shares authorized for grant under Section 5.1: (i) Shares tendered by a Participant or withheld by the Company in payment of the exercise price or purchase price of an Award or Prior Plan Award; (ii) Shares tendered by the Participant or withheld by the Company to satisfy any tax withholding obligation with respect to an Award or Prior Plan Award; (iii) Shares subject to a SAR that are not issued in connection with the stock settlement of the SAR on exercise thereof; and (iv) Shares purchased on the open market with the cash proceeds from the exercise of Options. Subject to the Inducement Award Rules, Shares issued in connection with Awards that are assumed, converted or substituted pursuant to a merger, acquisition or similar transaction shall not reduce the number of Shares available for issuance under the Plan.

5.3    Dividend Equivalents. Any dividend equivalents distributed as Shares under the Plan shall be applied against the number of Shares available for Awards. Dividend equivalents distributed as cash shall have no impact on the number of Shares available for Awards.

SECTION 6.    TERMS AND CONDITIONS OF OPTIONS.

6.1    Stock Option Agreement. Each Grant of an Option under the Plan shall be evidenced and governed exclusively by a Stock Option Agreement between the Optionee and the Company. Such Option shall be subject to all applicable terms and conditions of the Plan and may be subject to any other terms and conditions that are not inconsistent with the Plan and that the Committee deems appropriate for inclusion in a Stock Option Agreement (including without limitation any performance conditions). The provisions of the various Stock Option Agreements entered into under the Plan need not be identical. The Stock Option Agreement shall also specify whether the Option is an ISO or an NSO. No dividends or dividend equivalents will be paid with respect to Options.

6.2    Number of Shares. Each Stock Option Agreement shall specify the number of Shares that are subject to the Option and shall be subject to adjustment of such number in accordance with Section 10.

6.3    Exercise Price. An Option's Exercise Price shall be established by the Committee and set forth in a Stock Option Agreement. The Exercise Price of an Option shall not be less than

8

100% of the Fair Market Value (110% for ISO grants to 10-Percent Stockholders) on the date of Grant.

6.4    Exercisability and Term. Each Stock Option Agreement shall specify the date when all or any installment of the Option is to become exercisable. The Stock Option Agreement shall also specify the term of the Option; provided that the term of an Option shall in no event exceed seven years from the date of Grant (five years from the date of Grant for ISO grants to 10-Percent Stockholders). A Stock Option Agreement may provide for accelerated vesting in the event of the Participant's death, Disability, or other events. Notwithstanding any other provision of the Plan, no Option can be exercised after the expiration date provided in the applicable Stock Option Agreement. Unless the Committee expressly provides otherwise, no Stock Option will be deemed to have been exercised until the Committee receives a notice of exercise (in form acceptable to the Committee) which may be an electronic notice, signed (including electronic signature in form acceptable to the Committee) by the appropriate person and accompanied by any payment required under the Award. A Stock Option exercised by any person other than the Participant will not be deemed to have been exercised until the Committee has received such evidence as it may require that the person exercising the Award has the right to do so.

6.5    Payment for Option Shares. The Exercise Price of Shares issued upon exercise of Options shall be payable in cash at the time when such Shares are purchased, except as follows and if so provided for in an applicable Stock Option Agreement:

(a)    Surrender of Stock. Payment for all or any part of the Exercise Price may be made with Shares which have already been owned by the Optionee; provided that the Committee may, in its sole discretion, require that Shares tendered for payment be previously held by the Optionee for a minimum duration (e.g., to avoid financial accounting charges to the Company's earnings). Such Shares shall be valued at their Fair Market Value.

(b)    Cashless Exercise. Payment for all or a part of the Exercise Price may be made through Cashless Exercise.

(c)    Other Forms of Payment. Payment may be made in any other form that is consistent with applicable laws, regulations and rules and approved by the Committee.

In the case of an ISO granted under the Plan, payment shall be made only pursuant to the express provisions of the applicable Stock Option Agreement. The Stock Option Agreement may specify that payment may be made in any form(s) described in this Section 6.5. In the case of an NSO granted under the Plan, the Committee may, in its discretion at any time, accept payment in any form(s) described in this Section 6.5.

6.6    Modifications or Assumption of Options. Within the limitations of the Plan and the Inducement Award Rules, the Committee may modify, extend or assume outstanding options or may accept the cancellation of outstanding options (whether granted by the Company or by another issuer) in return for the grant of new Options for the same or a different number of Shares and at the same or a different Exercise Price. Notwithstanding the preceding sentence or anything in the Plan to the contrary, no modification of an Option shall, without the consent of the Optionee, materially impair his or her rights or obligations under such Option.

6.7    Assignment or Transfer of Options. Except as otherwise provided in the applicable Stock Option Agreement and for no consideration and then only to the extent permitted by applicable law, no Option shall be transferable by the Optionee other than by will or by the laws of descent and distribution. Except as otherwise provided in the applicable Stock Option Agreement, an Option may be exercised during the lifetime of the Optionee only or by the guardian or legal representative of the Optionee. No Option or interest therein may be

9

assigned, pledged or hypothecated by the Optionee during his or her lifetime, whether by operation of law or otherwise, or be made subject to execution, attachment or similar process.

SECTION 7.    TERMS AND CONDITIONS OF STOCK APPRECIATION RIGHTS.

7.1    SAR Agreement. Each Award of a SAR under the Plan shall be evidenced by a SAR Agreement between the Participant and the Company. Such SAR shall be subject to all applicable terms of the Plan and may be subject to any other terms that are not inconsistent with the Plan (including without limitation any performance conditions). A SAR Agreement may provide for a maximum limit on the amount of any payout notwithstanding the Fair Market Value on the date of exercise of the SAR. The provisions of the various SAR Agreements entered into under the Plan need not be identical. SARs may be granted in consideration of a reduction in the Participant's compensation. No dividends or dividend equivalents will be paid with respect to SARs.

7.2    Number of Shares. Each SAR Agreement shall specify the number of Shares to which the SAR pertains and is subject to adjustment of such number in accordance with Section 10.

7.3    Exercise Price. Each SAR Agreement shall specify the Exercise Price. The Exercise Price of a SAR shall not be less than 100% of the Fair Market Value on the date of Grant.

7.4    Exercisability and Term. Each SAR Agreement shall specify the date when all or any installment of the SAR is to become exercisable. The SAR Agreement shall also specify the term of the SAR which shall not exceed seven years from the date of Grant. A SAR Agreement may provide for accelerated exercisability in the event of the Participant's death, Disability, or other events and may provide for expiration prior to the end of its term in the event of the termination of the Participant's Service.

7.5    Exercise of SARs. If, on the date when a SAR expires, the Exercise Price under such SAR is less than the Fair Market Value on such date but any portion of such SAR has not been exercised or surrendered, then such SAR shall automatically be deemed to be exercised as of such date with respect to such portion. Upon exercise of a SAR, the Participant (or any person having the right to exercise the SAR after the Participant's death) shall receive from the Company (i) Shares, (ii) cash or (iii) any combination of Shares and cash, as the Committee shall determine at the time of grant of the SAR, in its sole discretion. The amount of cash and/or the Fair Market Value of Shares received upon exercise of SARs shall, in the aggregate, be equal to the amount by which the Fair Market Value (on the date of surrender) of the Shares subject to the SARs exceeds the Exercise Price of the Shares.

7.6    Modification or Assumption of SARs. Within the limitations of the Plan and the Inducement Award Rules, the Committee may modify, extend or assume outstanding SARs or may accept the cancellation of outstanding SARs (including stock appreciation rights granted by another issuer) in return for the grant of new SARs for the same or a different number of Shares and at the same or a different Exercise Price. Notwithstanding the preceding sentence or anything in the Plan to the contrary, no modification of a SAR shall, without the consent of the Participant, materially impair his or her rights or obligations under such SAR.

7.7    Assignment or Transfer of SARs. Except as otherwise provided in the applicable SAR Agreement and then only for no consideration and to the extent permitted by applicable law, no SAR shall be transferable by the Participant other than by will or by the laws of descent and distribution. Except as otherwise provided in the applicable SAR Agreement, a SAR may be exercised during the lifetime of the Participant only or by the guardian or legal representative of the Participant. No SAR or interest therein may be assigned, pledged or hypothecated by the

10

Participant during his or her lifetime, whether by operation of law or otherwise, or be made subject to execution, attachment or similar process.

SECTION 8.   TERMS AND CONDITIONS FOR STOCK GRANTS.

8.1   <u>Time, Amount and Form of Awards</u>. Awards under this Section 8 may be granted in the form of a Stock Grant.

8.2   <u>Stock Grant Agreement</u>. Each Stock Grant awarded under the Plan shall be evidenced and governed exclusively by a Stock Grant Agreement between the Participant and the Company. Each Stock Grant shall be subject to all applicable terms and conditions of the Plan and may be subject to any other terms and conditions that are not inconsistent with the Plan that the Committee deems appropriate for inclusion in the applicable Stock Grant Agreement (including without limitation any performance conditions). The provisions of the Stock Grant Agreements entered into under the Plan need not be identical.

8.3   <u>Payment for Stock Grants</u>. Stock Grants may be issued with or without cash consideration under the Plan.

8.4   <u>Vesting Conditions</u>. Each Stock Grant may or may not be subject to vesting. Vesting shall occur in full or in installments upon satisfaction of the conditions specified in the Stock Grant Agreement, which may include Performance Goals pursuant to Section 4.5. A Stock Grant Agreement may provide for accelerated vesting in the event of the Participant's death, Disability, or other events.

8.5   <u>Assignment or Transfer of Stock Grants</u>. Except as provided in the applicable Stock Grant Agreement and then only for no consideration and to the extent permitted by applicable law, a Stock Grant awarded under the Plan shall not be anticipated, assigned, attached, garnished, optioned, transferred or made subject to any creditor's process, whether voluntarily, involuntarily or by operation of law. Any act in violation of this Section 8.5 shall be void. However, this Section 8.5 shall not preclude a Participant from designating a beneficiary who will receive any vested outstanding Stock Grant Awards in the event of the Participant's death, nor shall it preclude a transfer of vested Stock Grant Awards by will or by the laws of descent and distribution.

8.6   <u>Voting and Dividend Rights</u>. The holder of a Stock Grant awarded under the Plan shall have the same voting, dividend and other rights as the Company's other stockholders; provided that any dividend payable with respect to such Stock Grant shall not be paid to the holder until the holder's interest in such Stock Grant becomes non-forfeitable. A Stock Grant Agreement may require that any cash dividends be deemed to be reinvested in additional Shares subject to the Stock Grant (based on the Fair Market Value of a Share on the applicable dividend payment date). Such additional Shares subject to the Stock Grant shall be subject to the same conditions and restrictions as the Stock Grant with respect to which the dividends were paid. Such additional Shares subject to the Stock Grant shall not reduce the number of Shares available for issuance under Section 5.

8.7   <u>Modification or Assumption of Stock Grants</u>. Within the limitations of the Plan and Inducement Award Rules, the Committee may modify or assume outstanding Stock Grants or may accept the cancellation of outstanding Stock Grants (including stock granted by another issuer) in return for the grant of new Stock Grants for the same or a different number of Shares. Notwithstanding the preceding sentence or anything to the contrary, no modification of a Stock Grant shall, without the consent of the Participant, materially impair his or her rights or obligations under such Stock Grant.

SECTION 9.   TERMS AND CONDITIONS OF STOCK UNITS.

11

9.1     Stock Unit Agreement. Each grant of Stock Units under the Plan shall be evidenced by a Stock Unit Agreement between the Participant and the Company. Such Stock Units shall be subject to all applicable terms of the Plan and may be subject to any other terms that are not inconsistent with the Plan (including without limitation any performance conditions). The provisions of the various Stock Unit Agreements entered into under the Plan need not be identical. Stock Units may be granted in consideration of a reduction in the Participant's other compensation.

9.2     Number of Shares. Each Stock Unit Agreement shall specify the number of Shares to which the Stock Unit Grant pertains and is subject to adjustment of such number in accordance with Section 10.

9.3     Payment for Awards. To the extent that an Award is granted in the form of Stock Units, no cash consideration shall be required of the Award recipients.

9.4     Vesting Conditions. Vesting shall occur, in full or in installments, upon satisfaction of the conditions specified in the Stock Unit Agreement which may include Performance Goals pursuant to Section 4.5. A Stock Unit Agreement may provide for accelerated vesting in the event of the Participant's death, Disability, or other events.

9.5     Voting and Dividend Rights. The holders of Stock Units shall have no voting rights. Prior to settlement or forfeiture, any Stock Unit awarded under the Plan may, at the Committee's discretion, carry with it a right to dividend equivalents. Such right entitles the holder to be credited with an amount equal to all cash dividends paid on one Share while the Stock Unit is outstanding; provided that such dividend equivalents shall not be paid to the holder until the holder's interest in the underlying Stock Unit becomes non-forfeitable. Dividend equivalents may be converted into additional Stock Units subject to the same conditions as the Stock Units with respect to which the dividend equivalents relate. Settlement of dividend equivalents may be made in the form of cash, in the form of Shares, or in a combination of both. Any entitlement to dividend equivalents or similar entitlements shall be established and administered consistent either with an exemption from, or compliance with, the requirements of Section 409A of the Code.

9.6     Form and Time of Settlement of Stock Units. Settlement of vested Stock Units may be made in the form of (a) cash, (b) Shares or (c) any combination of both, as determined by the Committee at the time of the grant of the Stock Units, in its sole discretion. Methods of converting Stock Units into cash may include (without limitation) a method based on the average Fair Market Value of Shares over a series of trading days. Vested Stock Units may be settled in a lump sum or in installments. The distribution may occur or commence when the vesting conditions applicable to the Stock Units have been satisfied or have lapsed, or it may be deferred, in accordance with applicable law, to any later date. The amount of a deferred distribution may be increased by an interest factor or by dividend equivalents. Until an Award of Stock Units is settled, the number of such Stock Units shall be subject to adjustment pursuant to Section 10.

9.7     Creditors' Rights. A holder of Stock Units shall have no rights other than those of a general creditor of the Company. Stock Units represent an unfunded and unsecured obligation of the Company, subject to the terms and conditions of the applicable Stock Unit Agreement.

9.8     Modification or Assumption of Stock Units. Within the limitations of the Plan and Inducement Award Rules, the Committee may modify or assume outstanding Stock Units or may accept the cancellation of outstanding Stock Units (including stock units granted by another issuer) in return for the grant of new Stock Units for the same or a different number of Shares. Notwithstanding the preceding sentence or anything to the contrary, no modification of a Stock Unit shall, without the consent of the Participant, materially impair his or her rights or obligations under such Stock Unit.

12

9.9    <u>Assignment or Transfer of Stock Units</u>. Except as provided in the applicable Stock Unit Agreement and then only for no consideration and to the extent permitted by applicable law, Stock Units shall not be anticipated, assigned, attached, garnished, optioned, transferred or made subject to any creditor's process, whether voluntarily, involuntarily or by operation of law. Any act in violation of this Section 9.9 shall be void. However, this Section 9.9 shall not preclude a Participant from designating a beneficiary who will receive any outstanding vested Stock Units in the event of the Participant's death, nor shall it preclude a transfer of vested Stock Units by will or by the laws of descent and distribution.

SECTION 10.    PROTECTION AGAINST DILUTION.

10.1    <u>Basic Adjustments</u>. In the event of a subdivision of the outstanding Shares, a declaration of a dividend payable in Shares, a combination or consolidation of the outstanding Shares (by reclassification or otherwise) into a lesser number of Shares, a recapitalization, a spin-off or a similar occurrence that constitutes an equity restructuring within the meaning of FASB ASC 718, the Committee shall make such adjustments as it, in its sole discretion, deems appropriate in one or more of: (i) the number of Shares and the kind of shares or securities available for future Awards under Section 5; (ii) the number of Shares and the kind of shares or securities covered by each outstanding Award; or (iii) the Exercise Price under each outstanding SAR or Option. References in the Plan to Shares will be construed to include any stock or securities resulting from an adjustment pursuant to this Section 10. Unless the Committee determines otherwise, any adjustments hereunder shall be done on terms and conditions consistent with Section 409A of the Code.

10.2    <u>Certain Other Adjustments</u>. The Committee may also make adjustments of the type described in Section 10.1 above to take into account distributions to stockholders other than those provided for in Section 10.1, including, without limitation, a declaration of a dividend payable in a form other than Shares in an amount that has a material effect on the price of Shares or any other event, if the Committee determines that adjustments are appropriate to avoid distortion in the operation of the Plan and to preserve the value of Awards made hereunder, having due regard for the qualification of ISOs under Section 422 of the Code and the requirements of Section 409A of the Code, where applicable.

10.3    <u>Participant Rights</u>. Except as provided in this Section 10, a Participant shall have no rights by reason of any issue by the Company of stock of any class or securities convertible into stock of any class, any subdivision or consolidation of shares of stock of any class, the payment of any stock dividend or any other increase or decrease in the number of shares of stock of any class. If by reason of an adjustment pursuant to this Section 10 a Participant's Award covers additional or different shares of stock or securities, then such additional or different shares and the Award in respect thereof shall be subject to all of the terms, conditions and restrictions which were applicable to the Award and the Shares subject to the Award prior to such adjustment.

10.4    <u>Fractional Shares</u>. Any adjustment of Shares pursuant to this Section 10 shall be rounded down to the nearest whole number of Shares. Under no circumstances shall the Company be required to authorize or issue fractional shares and no consideration shall be provided as a result of any fractional shares not being issued or authorized.

SECTION 11.    EFFECT OF A CHANGE IN CONTROL.

11.1    <u>Default Vesting Provisions</u>. Unless otherwise provided for in an individual Award agreement or employment agreement, and except to the extent that an Award meeting the requirements of Section 11.2(a) (a "Replacement Award") is provided to the Participant to replace an existing Award (the "Replaced Award"), upon a Change in Control, all then-outstanding Awards shall vest in accordance with paragraphs (a) and (b) of this Section 11.1.

13

(a)    <u>Outstanding Awards that are Subject Solely to a Service Vesting Condition</u>. Upon a Change in Control, subject to Section 11.3, a Participant's then-outstanding Awards as to which vesting depends solely on the satisfaction of a service obligation by the Participant to the Company shall become fully vested and shall be settled in cash, Shares or a combination thereof as provided for under the applicable Award agreement upon or within thirty (30) days following such Change in Control (except to the extent that settlement of the Award must be made pursuant to its original schedule in order to comply with Section 409A of the Code).

(b)    <u>Outstanding Awards that are Subject to a Performance Vesting Condition.</u> Upon a Change in Control, subject to Section 11.3, a Participant's then-outstanding Awards as to which vesting depends upon the satisfaction of one or more performance conditions shall immediately vest and all performance conditions shall be deemed achieved based on the greater of (i) target performance and (ii) actual performance as determined by the Committee through the date of the Change in Control (unless the Committee determines that measurement of actual performance cannot reasonably be assessed, in which case performance shall be deemed achieved based on target performance). Such Awards shall be settled in cash, Shares or a combination thereof as provided for under the applicable Award Agreement upon or within thirty (30) days following such Change in Control (except to the extent that settlement of the Award must be made pursuant to its original schedule in order to comply with Section 409A of the Code).

11.2    <u>Definition of Replacement Award</u>.

(a)    An Award shall qualify as a Replacement Award if: (i) it is of the same type as the Replaced Award (or, it is of a different type as the Replaced Award, provided that the Committee, as constituted immediately prior to the Change in Control, finds such type acceptable); (ii) it has an intrinsic value at least equal to the value of the Replaced Award; (iii) it relates to publicly traded equity securities of the Company or its successor in the Change in Control or another entity that is affiliated with the Company or its successor following the Change in Control; (iv) its terms and conditions comply with Section 11.2(b); (v) vesting conditions continue on the same terms as set forth in the Replaced Award, provided that any performance-based vesting conditions shall be deemed to be satisfied at the greater of (A) target performance and (B) actual performance as determined by the Committee through the date of the Change in Control (unless the Committee determines that measurement of actual performance cannot reasonably be assessed, in which case performance shall be deemed achieved based on target performance); and (vi) its other terms and conditions are not less favorable to the holder of the Award than the terms and conditions of the Replaced Award (including the provisions that would apply in the event of a subsequent Change in Control). Without limiting the generality of the foregoing, a Replacement Award may take the form of a continuation of the Replaced Award if the requirements of the preceding sentence are satisfied. The determination of whether the conditions of this Section 11.2(a) are satisfied shall be made by the Committee, as constituted immediately before the Change in Control, in its sole discretion. Without limiting the generality of the foregoing, the Committee may determine the value of Awards and Replacement Awards that are Options or SARs by reference to either their intrinsic value or their fair value.

(b)    Upon an involuntary termination of service of a Participant by the Company or its successor other than for Cause within two years following the Change in Control, all Replacement Awards held by the Participant shall become fully vested and free of restrictions. Replacement Awards in the form of (i) Options or SARs shall remain fully exercisable according to the terms of the applicable Award agreement, and (ii) other Awards shall be paid or settled upon or within thirty (30) days of such Participant's termination of service. Notwithstanding the foregoing, with respect to any Award that is considered deferred compensation subject to Section 409A of the Code, settlement of such Award shall be made pursuant to its original schedule if necessary to comply with Section 409A of the Code.

14

11.3   Cashout of Awards.

(a)   Unless otherwise provided for in an Award agreement and subject to the requirements of Section 11.1, in the event of a Change in Control, with respect to any outstanding Option or SAR, the Committee shall have discretion to cause a cash payment to be made to the person who then holds such Option or SAR, in lieu of the right to exercise such Option or SAR or any portion thereof. In the event the Committee exercises its discretion to cause such cash payment to be made, the amount of such cash payment shall be equal to the amount by which (i) the aggregate fair market value (on the date of the Change in Control) of the Shares that are subject to such Option or SAR exceeds (ii) the aggregate Exercise Price under such Option or SAR. If the aggregate fair market value (on the date of the Change in Control) of the Shares that are subject to such Option or SAR is less than the aggregate Exercise Price or Grant Price (as applicable) of such Shares under such Option or SAR, such Option or SAR shall be cancelled without any payment.

(b)   Unless otherwise provided for in an Award agreement and subject to the requirements of Section 11.1, in the event of a Change in Control, with respect to an Award (other than an Option or SAR) that would otherwise be payable in Shares, the Committee shall have discretion to cause the payment of such Award to be made in cash instead of Shares. In the event the Committee exercises its discretion to cause such cash payment to be made, the amount of such cash payment shall be equal to the aggregate Fair Market Value, on the date of the Change in Control, of the Shares that would otherwise then be payable under such Award.

(c)   In the event the terms of a transaction impose an escrow, holdback, earnout or similar condition on payments to shareholders of the Company, the Committee may, in its discretion, require that amounts payable to Participants under or with respect to any Award in connection with such transaction also be subject to escrow, holdback, earnout or similar conditions on similar terms and conditions as such provisions apply to the shareholders of the Company, provided, however, that any such payments are required to be made by the fifth anniversary of such transaction or otherwise comply with Section 409A of the Code.

SECTION 12.   LIMITATIONS ON RIGHTS.

12.1   Participant Rights. A Participant's rights, if any, in respect of or in connection with any Award is derived solely from the discretionary decision of the Company to permit the individual to participate in the Plan and to benefit from a discretionary Award. By accepting an Award under the Plan, a Participant will be deemed to have agreed to the terms of the Award and the Plan, and expressly acknowledges that there is no obligation on the part of the Company to continue the Plan and/or grant any additional Awards. Any Award granted hereunder is not intended to be compensation of a continuing or recurring nature, or part of a Participant's normal or expected compensation, and in no way represents any portion of a Participant's salary, compensation, or other remuneration for purposes of pension benefits, severance, redundancy, resignation or any other purpose. The existence of the Plan or the grant of any Award will not in any way affect the Company's right to award a person bonuses or other compensation in addition to Awards under the Plan.

Neither the Plan nor any Award granted under the Plan shall be deemed to give any individual a right to remain an Employee, Consultant or Director. The Company and its Parents and Subsidiaries and Affiliates reserve the right to terminate the Service of any person at any time, and for any reason, subject to applicable laws and a written employment agreement (if any), and such terminated person shall be deemed irrevocably to have waived any claim to damages or specific performance for breach of contract or dismissal, compensation for loss of office, tort or otherwise with respect to the Plan or any outstanding Award that is forfeited and/or is terminated by its terms or to any future Award. The loss of existing or potential profit in Awards will not constitute an element of damages in the event of termination of Service for any

15

reason, even if the termination is in violation of an obligation of the Company or any Affiliate to the Participant.

12.2    Stockholders' Rights. A Participant shall have no dividend rights, voting rights or other rights as a Stockholder with respect to any Shares covered by his or her Award prior to the issuance of such Shares (as evidenced by an appropriate entry on the books of the Company or a duly authorized transfer agent of the Company). No adjustment shall be made for cash dividends or other rights for which the record date is prior to the date when such Shares are issued, except as expressly provided in Section 10.

12.3    Regulatory Requirements. Any other provision of the Plan notwithstanding, the obligation of the Company to issue Shares or other securities under the Plan shall be subject to all applicable laws, rules and regulations and such approval by any regulatory body as may be required. The Company reserves the right to restrict, in whole or in part, the delivery of Shares or other securities pursuant to any Award prior to the satisfaction of all legal requirements relating to the issuance of such Shares or other securities, to their registration, qualification or listing or to an exemption from registration, qualification or listing.

12.4    Section 409A. Awards under the Plan are intended either to be exempt from the rules of Section 409A of the Code or to satisfy those rules, and the Plan and such Awards shall be construed accordingly. Granted Awards may be modified at any time, in the Committee's discretion, so as to increase the likelihood of exemption from or compliance with the rules of Section 409A of the Code, so long as such modification does not result in a reduction in value to the applicable Participant (unless the Participant consents in writing to such modification). Notwithstanding anything to the contrary in the Plan, neither the Company, any Subsidiary, nor the Board, nor any person acting on behalf of the Company, any Subsidiary, or the Board, shall be liable to any Participant or to the estate or beneficiary of any Participant or to any other holder of an Award by reason of any acceleration of income, or any additional tax, asserted by reason of the failure of an Award to satisfy the requirements of Section 409A of the Code.

If a Participant is a "specified employee" as defined in Section 409A of the Code (and as applied according to procedures of the Company and its Affiliates) as of his separation from service, to the extent any payment under this Plan or pursuant to the grant of an Award constitutes deferred compensation (after taking into account any applicable exemptions from Section 409A of the Code), and to the extent required by Section 409A of the Code, no payments due under this Plan or pursuant to an Award may be made until the earlier of: (i) the first day of the seventh month following the Participant's separation from service, or (ii) the Participant's date of death; provided, however, that any payments delayed during this six-month period shall be paid in the aggregate in a lump sum, without interest, on the first day of the seventh month following the Participant's separation from service.

12.5    Additional Restrictions. The Committee may cancel, rescind, withhold or otherwise limit or restrict any Award at any time if the Participant is not in compliance with all applicable provisions of the Award agreement and the Plan, or if the Participant breaches any agreement with the Company or its Subsidiaries or Affiliates with respect to non-competition, nonsolicitation or confidentiality. Without limiting the generality of the foregoing, the Committee may recover Awards made under the Plan and payments under or gain in respect of any Award to the extent required to comply with any Company policy or Section 10D of the Securities Exchange Act of 1934, as amended, or any stock exchange or similar rule adopted under said Section or any other applicable law or regulation.

SECTION 13.    WITHHOLDING TAXES.

13.1    General. A Participant shall make arrangements satisfactory to the Company for the satisfaction of any withholding tax obligations that arise in connection with his or her Award.

16

The Company shall not be required to issue any Shares or make any cash payment under the Plan until such obligations are satisfied.

13.2   Share Withholding. If a public market for the Company's Shares exists, the Committee may permit a Participant to have the Company withhold all or a portion of any Shares that otherwise would be issued to him or her or by surrendering all or a portion of any Shares that he or she previously acquired in satisfaction of all or a part of his or her withholding or income tax obligations (but not in excess of the maximum statutory withholding rate). Such Shares shall be valued based on the value of the actual trade or, if there is none, the Fair Market Value as of the previous day. Any payment of taxes by assigning Shares to the Company may be subject to restrictions, including, but not limited to, any restrictions required by rules of the SEC. The Committee may, in its discretion, also permit a Participant to satisfy withholding or income tax obligations related to an Award through Cashless Exercise or through a sale of Shares underlying the Award.

SECTION 14.   DURATION AND AMENDMENTS.

14.1   Term of the Plan. The Plan shall become on the Effective Date. The Plan shall terminate on the seventh anniversary of the Effective Date and may be terminated on any earlier date pursuant to this Section 14, but previously granted Awards may continue beyond that date in accordance with their terms.

14.2   Right to Amend or Terminate the Plan. The Board may amend or terminate the Plan at any time and for any reason. Any such termination of the Plan, or any amendment thereof, shall not impair in any material respect any Award previously granted under the Plan. No Awards shall be granted under the Plan after the Plan's termination. An amendment of the Plan shall be subject to the approval of the Company's stockholders only to the extent such approval is required by applicable laws, regulations or rules (including the Code and applicable stock exchange requirements).

14.3   Right to Amend or Substitute Awards. In addition to Section 10 or 11 of the Plan, the Committee may, without obtaining stockholder approval unless required by applicable laws, regulations or rules (including the Code and applicable Exchange requirements), (a) amend the terms of outstanding Options or SARs to reduce the Exercise Price per Share of such Options or SARs, or (b) cancel outstanding Options or SARs in exchange for cash, other Awards or Options or SARs with an Exercise Price per Share that is less than the Exercise Price per Share of the original Options or SARs.

SECTION 15.   WAIVER OF JURY TRIAL

By accepting an Award under the Plan, each Participant waives any right to a trial by jury in any action, proceeding or counterclaim concerning any rights under the Plan and any Award, or under any amendment, waiver, consent, instrument, document or other agreement delivered or which in the future may be delivered in connection therewith, and agrees that any such action, proceedings or counterclaim will be tried before a court and not before a jury. By accepting an Award under the Plan, each Participant certifies that no officer, representative, or attorney of the Company has represented, expressly or otherwise, that the Company would not, in the event of any action, proceeding or counterclaim, seek to enforce the foregoing waivers. Notwithstanding anything to the contrary in the Plan, nothing herein is to be construed as limiting the ability of the Company and a Participant to agree to submit disputes arising under the terms of the Plan or any Award made hereunder to binding arbitration or as limiting the ability of the Company to require any eligible individual to agree to submit such disputes to binding arbitration as a condition of receiving an Award hereunder.

17

**Separation Agreement and General Release**

This Separation Agreement and General Release (the "Agreement") is by and between James G. Hall ("Executive") and Lifecore Biomedical, Inc. (the "Company") effective as of the Effective Date (as defined in Section 4 below). In consideration of the mutual promises and covenants contained herein, it is hereby agreed by and between the parties hereto as follows:

1.      **Separation Date, Accrued Amounts and Separation Benefits.** Executive's employment with Lifecore Biomedical, Inc. (the "Company") will end effective _____, 2024 (the "Separation Date"). Executive acknowledges that the Company has paid Executive in a single lump-sum payment on the Separation Date any earned, but unpaid, base salary and accrued, but unused paid vacation to which Executive is entitled through the Separation Date (collectively the "Accrued Amounts"). If Executive signs this Agreement no earlier than the Separation Date and no later than the 22nd day after Executive receives it (the "Offer Period"), the Company shall provide Executive with the separation benefits described in Sections 1(a) through (d) below (collectively, the "Separation Benefits") provided this Agreement becomes effective and enforceable. All payments made by the Company under this Agreement shall be reduced by any tax or other amounts required to be withheld by the Company under applicable law.

(a)      Severance Payment. The Company shall pay Executive the amount of $750,000, which represents the sum of (i) twelve (12) months' of Executive's current base salary plus (ii) 50% of Executive's target incentive compensation under the annual incentive plan approved by the Board of Directors of the Company for fiscal year 2024 (the "2024 Annual Incentive Plan"). The foregoing severance amount will be paid in equal installments on the Company's regularly scheduled payroll dates over twelve (12) months, with the first payment, which shall be retroactive to the day immediately following the Separation Date, being due and payable on the Company's next regular payday for executives that follows the Effective Date. No payment shall be made or begin before the Effective Date of this Agreement.

(b)      2024 Annual Incentive Plan. The Company shall pay Executive the annual incentive award to which Executive is entitled, if any, under the 2024 Annual Incentive Plan, based on actual performance (disregarding any requirement that Executive be employed through the end of the determination period or on the date the payment is made and without reduction for any other Separation Benefit), and pro-rated on a per diem basis through the Separation Date, which shall be paid at the same time bonuses for such year are paid to active employees under the terms of the 2024 Annual Incentive Plan (but no later than March 15, 2025).

(c)      Equity. All stock options granted to Executive and outstanding on the Separation Date will vest and become exercisable in full, as of the Separation Date but subject to the effectiveness of this Agreement. All restricted stock units granted to Executive and outstanding on the Separation Date will vest and be settled into common stock of the Company as of the Separation Date but subject to the effectiveness of this Agreement. Under separate cover Executive has been provided with a statement of Executive's outstanding stock options and restricted stock units. Executive understands and agrees that all vested options must be exercised within six (6) months following the Separation Date in accordance with the applicable stock incentive plan and related stock option agreements. Executive is aware that IRS regulations require that any Incentive Stock Options (ISO) not exercised within 90 days following the Separation Date will become Nonqualified Stock Options for taxing and reporting purposes.

(d)      COBRA. During the period commencing on the Separation Date and ending on the earlier of (i) the 12-month anniversary of the Separation Date and (ii) the date on which Executive becomes eligible for coverage under the group health plan of a subsequent employer (of which eligibility Executive hereby agrees to give prompt notice to the Company)

(in any case, the "COBRA Period"), the Company will directly pay or, at its election, reimburse Executive, with respect to each month during the COBRA Period, the monthly premium for continued healthcare coverage for Executive (including Executive's spouse and any eligible dependents) that is no more favorable than the coverage under the Company's group health plans as of immediately prior to the Separation Date; provided, that in no event shall such amount exceed the cost actually paid by Executive for such continued healthcare coverage. Notwithstanding the foregoing, if (x) any plan pursuant to which such benefits are provided is not, or ceases prior to the expiration of the period of continuation coverage to be, exempt from the application of Section 409A (as defined below) under Treasury Regulation Section 1.409A-1(a)(5), or (y) the Company is otherwise unable to continue to cover Executive under its group health plans without incurring penalties (including without limitation, pursuant to Section 2716 of the Public Health Service Act or the Patient Protection and Affordable Care Act), then, in either case, each remaining premium payment under this Section 1(d) shall thereafter be paid to Executive in substantially equal monthly installments over the COBRA Period (or the remaining portion thereof).  To be eligible for this benefit, Executive shall be required to make a valid and timely election to continue healthcare coverage under the Company's group health plans pursuant to Section 4980B of the Internal Revenue Code of 1986, as amended and the regulations thereunder (i.e., by electing COBRA). In addition, Executive shall be required to provide complete and accurate documentation evidencing Executive's actual premium payments for continued healthcare coverage in order to receive reimbursement from the Company pursuant to this Section 1(d).

(e)    Resignations. Effective as of the Separation Date, Executive hereby resigns from the positions of (a) President and Chief Executive Officer of the Company, (b) a director of the Company, (c) a member of any committee of the Board of Directors of the Company, and (d) each and every position Executive holds as an officer, employee, representative, board member, committee member, or otherwise with the Company or any affiliate of the Company. Executive shall execute resignation letters or other documents reasonably requested by the Company to memorialize the foregoing.

**2.    General Release and Waiver of Claims.** In exchange for the consideration provided by the Company in this Agreement, Executive and Executive's heirs, executors, representatives, administrators, agents, and assigns (collectively the "Releasing Parties") irrevocably and unconditionally fully and forever waive, release, and discharge the Company and the Company's parents, subsidiaries, affiliates, predecessors, successors, and assigns, and each of its and their respective present and past agents, officers, directors, owners, employees, insurers, and attorneys, in their corporate and individual capacities (collectively, the "Released Parties"), from any and all claims, demands, actions, causes of actions, judgments, rights, fees, damages, debts, obligations, liabilities, and expenses of any kind whatsoever, whether known or unknown (collectively, "Claims"), that the Releasing Parties may have or have ever had against the Released Parties, or any of them, from the beginning of time up to and including the date of Executive's execution of this Agreement, including, but not limited to:

(a)    any and all claims under Title VII of the Civil Rights Act of 1964 (Title VII), the Americans with Disabilities Act (ADA), the Family and Medical Leave Act (FMLA), the Fair Labor Standards Act (FLSA), the Equal Pay Act, the Employee Retirement Income Security Act (ERISA), the Civil Rights Act of 1991, Section 1981 of U.S.C. Title 42, the Fair Credit Reporting Act (FCRA), the National Labor Relations Act (NLRA), the Age Discrimination in Employment Act (ADEA), the Genetic Information Nondiscrimination Act (GINA), the Minnesota Human Rights Act (MHRA), the Minnesota Whistleblower Act (MWA), other claims allowed under Minnesota Statute Chapter 181, the California Fair Employment and Housing Act (FEHA), the California Labor Code, the California Constitution, all including any amendments and their respective implementing regulations, and any other federal, state, local, or foreign law (statutory, regulatory, or otherwise) that may be legally waived and released; for the

2

avoidance of doubt, the identification of specific statutes is for purposes of example only, and the omission of any specific statute or law shall not limit the scope of this general release in any manner;

(b)  any and all claims for compensation of any type whatsoever, including but not limited to claims for salary, wages, bonuses, commissions, incentive compensation, paid leave, vacation, sick pay, or severance;

(c)  any and all claims arising under tort, contract, or quasi-contract law, including but not limited to claims of breach of an express or implied contract, tortious interference with a contract or prospective business advantage, breach of the covenant of good faith and fair dealing, promissory estoppel, detrimental reliance, invasion of privacy, nonphysical injury, personal injury or sickness, or any other harm, wrongful or retaliatory discharge, fraud, defamation, and negligent or intentional infliction of emotional distress; and

(d)  any and all claims for monetary or equitable relief, including but not limited to attorneys' fees and costs, back pay, front pay, reinstatement, experts' fees, medical fees or expenses, costs and disbursements, punitive damages, liquidated damages, and penalties.

This general release and waiver of claims excludes, and Executive does not waive, release, or discharge: (i) any right to file an administrative charge or complaint with, or testify, assist, or participate in an investigation, hearing, or proceeding conducted by, the Equal Employment Opportunity Commission (EEOC), Minnesota Department of Human Rights, the California Civil Rights Department, or other similar federal or state administrative agencies, although Executive waives any right to monetary relief related to any filed charge or administrative complaint; (ii) claims that cannot be waived by law, (iii) any right to file an unfair labor practice charge under the National Labor Relations Act (NLRA); (iv) indemnification rights Executive has against the Company under agreement or applicable law; and (v) Executive's rights under this Agreement. Notwithstanding anything herein or in the Prior Agreements to the contrary, Executive is not limited in any way from (a) reporting possible violations of federal laws or regulations to the Securities and Exchange Commission ("SEC") or other governmental agencies, or making other disclosures protected under the whistleblower provisions of federal laws or regulations or (b) receiving an award for information provided to the SEC or such other governmental agencies.

**3.  Section 1542 Waiver.** Executive understands and agree that the claims released in Section 2 above include not only claims presently known to Executive, but also include all unknown or unanticipated claims, rights, demands, actions, obligations, liabilities, and causes of action of every kind and character that would otherwise come within the scope of the released claims as described in Section 2. Executive understands that he may hereafter discover facts different from what he now believes to be true, which if known, could have materially affected this Agreement, but Executive nevertheless waives any claims or rights based on different or additional facts. Executive knowingly and voluntarily waives any and all rights or benefits that he may now have, or in the future may have, under any other state or federal statute or common law principle limiting the scope of a general release, including but not limited to the terms of Section 1542 of the Civil Code of the State of California, which provides as follows:`

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

3

**4.**    **Executive's Acknowledgement and Revocation/Rescission Rights**. Executive understands that Executive has seven (7) calendar days from the date of signing this Agreement to revoke his release of claims under the Age Discrimination in Employment Act (ADEA), and fifteen (15) calendar days from the date of signing this Agreement to rescind his release of claims under the Minnesota Human Rights Act (MHRA). To be effective, the revocation or rescission must be in writing and delivered to directed to the Chair of the Board of Directors, 3515 Lyman Blvd., Chaska, Minnesota 55318, by hand or mail within the respective 7-day or 15-day time period. If delivered by mail, the rescission/revocation must be postmarked within the required period, properly addressed to the Chairman of the Board, and sent by certified U.S. mail, return receipt requested. Executive understand that if he revokes or rescinds any portion of this Agreement, this Agreement (other than the resignations set forth in Section 1(e) above) shall have no force or effect. This Agreement will be effective upon the expiration of both the 7-day revocation period and the 15-day rescission period if not revoked or rescinded (the "Effective Date"). By signing this Agreement, Executive hereby acknowledges and confirms that:

    (a)    Executive has read this Agreement in its entirety and understands all of its terms.

    (b)    The Company has advised Executive in writing to consult with an attorney, and Executive has consulted with his attorney before signing this Agreement.

    (c)    Executive knowingly, freely, and voluntarily agrees to all of the terms and conditions set out in this Agreement including, without limitation, the waiver, release, and covenants contained in it.

    (d)    Executive is executing this Agreement, including the waiver and release, in exchange for good and valuable consideration in addition to anything of value to which Executive is otherwise entitled.

    (e)    Executive was given at least twenty-one (21) calendar days to consider the terms of this Agreement. If Executive signs this Agreement before 21 calendar days have elapsed, he voluntarily waives the remainder of the 21-day review period, and any subsequent changes to this Agreement, whether material or immaterial, do not restart the running of the 21-day period.

    (f)    Executive understands that the release in this paragraph does not apply to any rights and claims that may arise after the date on which Executive signs this Agreement.

**5.**    **Representations and Warranties.** By signing below, Executive represents and warrants as follows:

    (a)    There are no pending complaints, charges or lawsuits filed by Executive against any of the Released Parties. If any local, state, or federal agency or court assumes jurisdiction of any complaint or charge against the Company on Executive's behalf, Executive is not entitled to any further payment from the Company of any nature (including attorneys' fees and costs incurred).

    (b)    Executive is the sole and lawful owner of all rights, title and interest in and to all matters released under Section 2, above, and Executive has not assigned or transferred, or purported to assign or transfer, any of such released matters to any other person or entity.

    (c)    Executive has been properly paid for all hours worked for the Company, that all salary, wages, commissions, bonuses, and other compensation due to Executive have

4

been paid, and that Executive is not owed anything else from the Company other than as provided for in this Agreement.

(d)     The Company has reimbursed Executive for all Company-related expenses incurred by Executive in direct consequence of the discharge of Executive's duties, or of Executive's obedience to the directions of the Company.

(e)     The Company has not denied Executive the right to take leave under the Family and Medical Leave Act or any other federal, state or local leave law.

(f)     Executive has not suffered or incurred any workplace injury in the course of Executive's employment with the Company, other than any injury that was made the subject of a written injury report before Executive signed this Agreement.

(g)     Executive confirms that the Noncompetition and Nonsolicitation Agreement dated July 10, 2006 and the Employee Agreement dated January 8, 1999 (the "Prior Agreements") survive the termination of Executive's employment, and Executive's execution of this Agreement.

**6.     Cooperation; Consulting; Insurance.** Executive agrees to provide reasonable assistance and cooperation to the Company and its representatives, (without the payment of further consideration) concerning any matter of which Executive is knowledgeable. For the period from the Separation Date until the one year anniversary thereof, Executive agrees to be available, (without the payment of further consideration) upon the Company's request, to discuss matters relating to the Company's business operations; provided that (a) Executive shall not be required to devote any more than 10 hours per week for the first six months following the Separation Date, (b) shall not be required to devote any more than 10 hours per month for the second six months following the Separation Date, and (c) if so requested by the Company, Executive shall enter into the Company's standard form of independent contractor agreement including the terms of this Section 6. Executive further agrees to personally provide the Company and its representatives, reasonable assistance and cooperation (without the payment of further consideration) relating to any pending or future investigation, lawsuit or claim about which Executive is knowledgeable. Executive shall be entitled the rights and benefits of an "Indemnitee" under the Indemnification Agreement between Executive and the Company with an effective date of August 10, 2022 to the same extent as if Executive were serving as an officer of the Company in providing assistance, cooperation, consultation or advice to the Company pursuant to this Section. The Company's Directors' and Officers' insurance coverage shall continue to apply to any claims brought against Executive relating to Executive's officer or director capacity in accordance with the relevant policy.

**7.     Return of Documents and Property.** Executive has returned all Company property, including all identification cards or badges, access codes or devices, keys, laptops, computers, telephones, mobile phones, hand-held electronic devices, credit cards, electronically stored documents or files, physical files, all copies thereof, and any other Company property in Executive's possession; except that Executive shall be entitled to keep the laptop issued to him, provided that the Company information on such laptop shall be subject to the Prior Agreements.

**8.     No Admission of Liability.** Nothing in this Agreement shall be construed as an admission by the Company of any wrongdoing, liability, or noncompliance with any federal, state, city, or local rule, ordinance, statute, common law, or other legal obligation. The Company specifically disclaims and denies any wrongdoing or liability to Executive.

**9.     Successors and Assigns.** The Company may freely assign this Agreement at any time. This Agreement shall inure to the benefit of the Company and its successors and assigns.

5

Executive shall not assign this Agreement in whole or in part. Any purported assignment by Executive shall be null and void from the initial date of the purported assignment.

**10.    Entire Agreement.** This Agreement contains all of the understandings and representations between the Company and Executive with respect to its subject matter and supersedes all prior and contemporaneous understandings, discussions, agreements, representations, and warranties, both written and oral, regarding such subject matter. Notwithstanding the foregoing sentence, Executive remains bound by the Prior Agreements.

**11.    Released Parties.** Each of the Released Parties is an intended third-party beneficiary of this Agreement having full rights to enforce this Agreement.

**12.    Governing Law, Jurisdiction, and Venue.** This Agreement and all matters arising out of or relating to this Agreement and Employee's employment with the Company shall be governed by and construed in accordance with the laws of the State of Minnesota without regard to any conflicts of laws principles that would require the laws of any other jurisdiction to apply. Any action or proceeding to enforce this Agreement shall be brought only in the state or federal courts located in the State of Minnesota.

**13.    Modification and Waiver.** No provision of this Agreement may be amended or modified unless the amendment or modification is agreed to in writing and signed by the Parties. No waiver by any Party of any breach by any other party of any provision of this Agreement shall be deemed a waiver of any other provision, nor shall the failure of or delay by any Party in exercising any right, power, or privilege under this Agreement operate as a waiver to preclude any other or further exercise of any right, power, or privilege.

**14.    Severability.** If any provision of this Agreement is found by a court of competent jurisdiction to be invalid, illegal, or unenforceable in any respect, or enforceable only if modified, such finding shall not affect the validity of the remainder of this Agreement, which shall remain in full force and effect and continue to be binding on the Parties.

**15.    Interpretation.** Captions and headings of the sections of this Agreement are intended solely for convenience and no provision of this Agreement is to be construed by reference to the caption or heading of any section or paragraph. This Agreement shall not be construed against either Party as the author or drafter of the Agreement, but shall be deemed to have been drafted by both parties.

**16.    Counterparts.** The Parties may execute this Agreement in counterparts, each of which shall be deemed an original and shall constitute an effective, binding agreement on each of the undersigned, and all of which taken together shall constitute one and the same instrument. Delivery of an executed signature page of this Agreement, including by electronic mail in portable document format (.pdf), has the same effect as delivery of an executed original of this Agreement.

[SIGNATURE BLOCK ON FOLLOWING PAGE]

6

**By signing this Agreement, Executive acknowledges that Executive does so voluntarily after carefully reading and fully understanding each provision and all of the effects of this Agreement, which includes a release of known and unknown claims and restricts future legal action against the Company and other Released Parties.**

COMPANY:

 LIFECORE BIOMEDICAL, INC.


By:＿

Its:＿

Dated:＿

EXECUTIVE:


＿
James G. Hall

Dated:＿

**Lifecore Biomedical Concludes Strategic Evaluation Process, Announces Management Succession and Board Changes**

*Appoints Paul Josephs, an executive with 25 years of CDMO experience as CEO, to succeed current CEO James Hall following his retirement*

*Announces changes to its Board of Directors, appoints new Board Chair*

CHASKA, Minn., March 20, 2024 (GLOBE NEWSWIRE) -- Lifecore Biomedical, Inc. (NASDAQ: LFCR) ("Lifecore" or the "Company"), a fully integrated contract development and manufacturing organization ("CDMO"), today announced that its Board of Directors unanimously approved the conclusion of its review of strategic alternatives that was initiated in March 2023, and, concurrently therewith, announced several strategic updates related to its operations on a stand-alone basis.

**Board Concludes its Review of Strategic Alternatives**

After evaluating a full range of strategic alternatives with the support of its advisors, Lifecore's Board of Directors unanimously concluded that the best way to maximize value for stockholders at this time is to continue executing on the Company's standalone strategic plan. This conclusion was based on an expansive strategic review process, including outreach to and engagement with over 75 buyers, including both strategic buyers and financial sponsors.

"The Board of Directors appreciates all of the hard work put into the strategic review process by the Company and its advisors. The Board looks forward to working with the management team to lead the Company's execution on its strategic plan," said Craig Barbarosh, Chairman of the Board.

Christopher Kiper, Lifecore Director and Chief Investment Officer of Legion Partners Asset Management, LLC, commented, "I am pleased with the exhaustive process the Board undertook in conducting the strategic review, which ultimately concluded that executing on Lifecore's strategic plan as a standalone company will drive the highest shareholder value. While the past year has been challenging for the Company, I believe that Lifecore has a bright future, and am optimistic about many improvements in the business, including significant investments in expanding our injectable fill/finish capacity for vials and syringes, recent new commercial contracts, existing contract enhancements and commercialization of new products – and the Board continues to expect Lifecore to emerge from the trough and return to a solid growth trajectory in the second half of fiscal 2024."

Over the past three years, Lifecore has strategically allocated substantial capital towards augmenting its aseptic production capacity and expanding its development pipeline to address the growing demand for injectable fill/finish capabilities by the pharmaceutical industry given new innovations they are bringing to market. With these investments, Lifecore believes it is positioned for substantial growth as its additional aseptic capacity becomes available. Provided Lifecore continues to execute on its current strategic plan, including the installation and qualification of its high-speed multi-purpose 5-head and 10-head isolator fillers, Lifecore's theoretical annual aseptic production capacity is estimated to more than triple the Company's current theoretical capacity from 22 million units to up to approximately 70 million units in fiscal year 2027. The current estimates for theoretical capacity have resulted from extensive factory acceptance testing associated with the new isolator fillers, including evaluating filling speeds and volumes, modeling the types of product formulations under evaluation within our pipeline. The details of Lifecore's long-range plan will be discussed by its management team at an Investor Day that is anticipated to be scheduled later in calendar 2024.

With the filing of the Annual Report on Form 10-K recently completed, Lifecore has shifted its efforts towards completing its Quarterly Report on Form 10-Q with respect to the fiscal first quarter of 2024 and becoming current on its SEC reports as promptly as possible. Management intends to update investors via press release, as soon as practicable, to the date and time for a business update conference call to discuss its Fiscal 2024 First Quarter results and select preliminary results for Fiscal 2024 Second and Third Quarters, once available.

**Commences Leadership Transition with Naming of New CEO**

In connection with the conclusion of its strategic evaluation process, the Company announced that it has appointed Paul Josephs as the Company's new President and Chief Executive Officer, effective on May 20, 2024, upon which date Mr. Josephs is also expected to join Lifecore's Board of Directors. This transition follows Jim Hall's announcement of his intent to retire as the Company's President and Chief Executive Officer and as a director of the Board effective upon Mr. Josephs' commencement. Mr. Hall intends to continue to support the transition for twelve months in an advisory capacity following his retirement.

Paul Josephs brings over 30 years of pharmaceutical industry experience to Lifecore, including over 25 years of CDMO experience. Since 2021, Mr. Josephs served as President & Chief Executive Officer and a member of the Board of Directors at Woodstock Sterile Solutions, a specialized full-service CDMO. Prior to joining Woodstock, Mr. Josephs served as Head of CDMO – Global Business Development at Viatris (formerly known as Mylan) since 2016 when it acquired DPT Laboratories. Mr. Josephs' work with DPT Laboratories began in 1997, where he held numerous progressive roles in sales and business development, culminating with a position of Senior Vice President, Sales, Marketing & Corporate Development. He holds a Bachelor of Arts degree from the University of Western Ontario in Canada.

"We are excited to attract such an accomplished executive to lead Lifecore in its next chapter of growth. Paul is a strong leader, and we look forward to leveraging his deep commercial experience and long-term relationships in the CDMO business to build upon the great work of Lifecore's team," stated Nelson Obus, Director and Chief Investment Officer of Wynnefield Capital, Inc. "The Board would like to thank Jim for his unwavering dedication to Lifecore that has spanned more than three decades. He has been instrumental in building Lifecore into the differentiated CDMO it is today, and we also want to recognize his leadership through this complex process of realigning the corporate focus over the past several years as we worked to unlock the intrinsic value that we see in Lifecore. We wish him a well-deserved and fruitful retirement."

Mr. Josephs, commented, "I am thrilled to join Lifecore and look forward to engaging with the team to continue servicing its customers and drive the business to new heights. Jim built a terrific culture and a strong reputation within the specialty CDMO industry of quality and service – characteristics that are of the utmost importance to me. The team has also built an excellent foundation for growth. I believe the business is at an inflection point and see exciting opportunities to utilize the growing capacity from Lifecore's two new isolator fillers through the cultivation and expansion of its development pipeline. I look forward to bringing my commercial experience to bear and work together to help Lifecore take the next step in its commercial evolution."

Mr. Hall, said "It has been an honor to work with all of the wonderful people at Lifecore over the course of my career – as well as with our valued customers, who have come to rely on our unrelenting focus on quality and performance. Following our transition to a stand-alone CDMO focused business, Lifecore has a solid foundation in place which gives me comfort that now is the right time for my retirement. I'd like to thank the Board for their support and look forward to supporting Paul as he transitions into his role as CEO."

**Announces Pending Board Changes**

Craig Barbarosh, the Company's Board Chair, has informed the Board of Directors that he intends to not stand for reelection at the upcoming Fiscal 2023 Annual Shareholders Meeting. The Board has named current independent director, Katrina Houde, as its Chairperson, effective at the upcoming Annual Shareholders Meeting. The resulting Board will be composed of eight members.

Katrina Houde, Director of Lifecore stated, "On behalf of the entire Board of Directors, I want to express our appreciation for Craig's leadership as Board Chair and director over the past five years. His guidance was invaluable in setting the Company's strategic initiative to refocus resources on our highest performing assets, which resulted in several asset dispositions that were necessary to raise the prominence of the Lifecore organization. We wish him well in his future endeavors."

**About Lifecore Biomedical**
Lifecore Biomedical, Inc. is a fully integrated contract development and manufacturing organization (CDMO) that offers highly differentiated capabilities in the development, fill and finish of complex sterile injectable pharmaceutical products in syringes and vials. As a leading manufacturer of premium, injectable grade Hyaluronic Acid, Lifecore brings more than 40 years of expertise as a partner for global and emerging biopharmaceutical and biotechnology companies across multiple therapeutic categories to bring their innovations to market. For more information about the Company, visit Lifecore's website at www.lifecore.com.

**Important Cautions Regarding Forward-Looking Statements**
This press release contains forward-looking statements regarding future events and our future results that are subject to the safe harbor created under the Private Securities Litigation Reform Act of 1995 and other safe harbors under the Securities Act of 1933 and the Securities Exchange Act of 1934. Words such as "anticipate", "estimate", "expect", "project", "plan", "intend", "believe", "may", "might", "will", "should", "can have", "likely" and similar expressions are used to identify forward-looking statements, including but not limited to statements regarding our future operational or financial performance and anticipated changes in our management or our board of directors . All forward-looking statements involve certain risks and uncertainties that could cause actual results to differ materially, including such factors among others, as the outcome of any evaluation of the Company's strategic alternatives or any discussions with any potential bidders related thereto, the Company's ability to become current with its reports with the Securities and Exchange Commission (the "SEC"), and the timing thereof, the ability of the

Company to successfully effectuate its strategic plan on its anticipated timeline, or at all, the decisions of third-party individuals regarding future employment, the Company's ability to regain compliance with applicable listing standards under Nasdaq, and its ability expand its relationship with its existing customers, as well as such other risks described in our most recent Annual Report on Form 10-K. For additional information about factors that could cause actual results to differ materially from those described in the forward-looking statements, please refer to our filings with the Securities and Exchange Commission, including the risk factors contained in our most recent Annual Report on Form 10-K. Forward-looking statements represent management's current expectations and are inherently uncertain. Except as required by law, we do not undertake any obligation to update forward-looking statements made by us to reflect subsequent events or circumstances.

**Contact Information:**
Investor Relations
Jeff Sonnek
(646) 277-1263
jeff.sonnek@icrinc.com

Media Relations
Dan McDermott
(646) 577-1811
dan.mcdermott@icrinc.com